ANDRUS, SECRETARY OF THE INTERIOR *v.* SHELL OIL CO. ET AL.

No. 78–1815.   Argued January 15, 1980—Decided June 2, 1980

Burger, C. J., delivered the opinion of the Court, in which White, Blackmun, Powell, Rehnquist, and Stevens, JJ., joined. Stewart, J., filed a dissenting opinion, in which Brennan and Marshall, JJ., joined, *post,* p. 673.

*Deputy Solicitor General Wallace* argued the cause for petitioner. On the briefs were *Solicitor General McCree, Assistant Attorney General Moorman, Deputy Solicitor General Clairborne, Mark I. Levy, Dirk D. Snel,* and *Robert L. Klarquist.*

*Fowler Hamilton* argued the cause for respondents. With him on the brief were *Richard W. Hulbert, Donald L. Morgan, H. Michael Spence, Claron C. Spencer,* and *Norma L. Comstock.*

Mr. Chief Justice Burger delivered the opinion of the Court.

The general mining law of 1872, 30 U. S. C. § 22 *et seq.,* provides that citizens may enter and explore the public domain, and search for minerals; if they discover "valuable mineral deposits," they may obtain title to the land on which such deposits are located.[1] In 1920 Congress altered this

---

[1] Discovery of a "valuable mineral" is not the only prerequisite of patentability. The mining law also provides that until a patent is issued a claimant must perform $100 worth of labor or make $100 of improvements on his claim during each year and that a patent may issue only on a showing that the claimant has expended a total of $500 on the claim. 30 U. S. C. §§ 28, 29. See *Hickel* v. *Oil Shale Corp.,* 400 U. S. 48 (1970). In addition, a claim "must be distinctly marked on the ground so that its boundaries can be readily traced." 30 U. S. C. § 28; *Kendall* v. *San Juan Silver Mining Co.,* 144 U. S. 658 (1892). If the requirements of the mining law are satisfied, the land may be patented for $2.50 per acre. 30 U. S. C.

program with the enactment of the Mineral Leasing Act. 41 Stat. 437, as amended, 30 U. S. C. § 181 *et seq.* The Act withdrew oil shale and several other minerals from the general mining law and provided that thereafter these minerals would be subject to disposition only through leases. A savings clause, however, preserved "valid claims existent at date of the passage of this Act and thereafter maintained in compliance with the laws under which initiated, which claims may be perfected under such laws, including discovery." [2]

The question presented is whether oil shale deposits located prior to the 1920 Act are "valuable mineral deposits" patentable under the savings clause of the Act.

## I

The action involves two groups of oil shale claims located by claimants on public lands in Garfield County, Colo., prior to the enactment of the Mineral Leasing Act. [3] The first group of claims, designated Mountain Boys Nos. 6 and 7, was located in 1918. In 1920, a business trust purchased the claims for $25,000, and in 1924 an application for patent was filed with

§ 37. There is no deadline within which a locator must file for patent, though to satisfy the discovery requirement the claimant must show the existence of "valuable mineral deposits" both at the time of location and at the time of determination. *Barrows* v. *Hickel,* 447 F. 2d 80, 82 (CA9 1971).

[2] The savings clause is contained in § 37 of the Act, 41 Stat. 451, as amended, which, as set forth in 30 U. S. C. § 193, provides in full:

"The deposits of coal, phosphate, sodium, potassium, oil, oil shale, and gas, herein referred to, in lands valuable for such minerals, including lands and deposits in Lander, Wyoming, coal entries numbered 18 to 49, inclusive, shall be subject to disposition only in the form and manner provided in this chapter, except as to valid claims existent on February 25, 1920, and thereafter maintained in compliance with the laws under which initiated, which claims may be perfected under such laws, including discovery."

[3] Oil shale is a sedimentary rock containing an organic material called kerogen which, upon destructive distillation, produces a substantial amount of oil.

the Department of the Interior. Some 20 years later, after extended investigative and adjudicatory proceedings, the patent was rejected "without prejudice" on the ground that it was not then vigorously pursued. In 1958, Frank W. Winegar acquired the claims and filed a new patent application. In 1964, Winegar conveyed his interests in the claims to respondent Shell Oil Company.

The second group of claims, known as Harold Shoup Nos. 1–4, was located in 1917. In 1923, the claims were acquired by Karl C. Schuyler who in 1933 bequeathed them to his surviving spouse. In 1960, Mrs. Schuyler incorporated respondent D. A. Shale, Inc., and transferred title to the claims to the corporation. Three months later, the corporation filed patent applications.

In 1964, the Department issued administrative complaints alleging that the Mountain Boys claims and the Shoup claims were invalid. The complaints alleged, *inter alia,* that oil shale was not a "valuable mineral" prior to the enactment of the 1920 Mineral Leasing Act.

The complaints were consolidated and tried to a hearing examiner who in 1970 ruled the claims valid. The hearing examiner observed that under established case law the test for determining a "valuable mineral deposit" was whether the deposit was one justifying present expenditures with a reasonable prospect of developing a profitable mine. See *United States* v. *Coleman,* 390 U. S. 599 (1968); *Castle* v. *Womble,* 19 L. D. 455 (1894).[4] He then reviewed the history

---

[4] In *Chrisman* v. *Miller,* 197 U. S. 313 (1905), this Court approved the Department of the Interior's "prudent-man test" under which discovery of a "valuable mineral deposit" requires proof of a deposit of such character that "a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine." *Castle* v. *Womble,* 19 L. D., at 457. Accord, *Best* v. *Humboldt Placer Mining Co.,* 371 U. S. 334, 335–336 (1963); *Cameron* v. *United States,* 252 U. S. 450, 459 (1920). In *United States* v. *Coleman,* the Court approved the Department's marketability

of oil shale operations in this country and found that every attempted operation had failed to show profitable production. On the basis of this finding and other evidence showing commercial infeasibility, the hearing examiner reasoned that "[i]f this were a case of first impression," oil shale would fail the "valuable mineral deposit" test. However, he deemed himself bound by the Department's contrary decision in *Freeman* v. *Summers*, 52 L. D. 201 (1927). There, the Secretary had written:

> "While at the present time there has been no considerable production of oil from shales, due to the fact that abundant quantities of oil have been produced more cheaply from wells, *there is no possible doubt of its value and of the fact that it constitutes an enormously valuable resource for future use by the American people.*
>
> "It is not necessary, in order to constitute a valid discovery under the general mining laws sufficient to support an application for patent, that the mineral *in its present situation* can be immediately disposed of at a profit." *Id.*, at 206. (Emphasis added.)

The hearing examiner ruled that *Freeman* v. *Summers* compelled the conclusion that oil shale is a valuable mineral subject to appropriation under the mining laws, and he upheld the Mountain Boys and Shoup claims as valid and patentable.

The Board of Land Appeals reversed. Adopting the findings of the hearing examiner, the Board concluded that oil shale claims located prior to 1920 failed the test of value because at the time of location there did not appear "as a *present* fact . . . a reasonable prospect of success in developing an operating mine that would yield a reasonable profit." (Emphasis in original.) The Board recognized that this conclusion was at odds with prior departmental precedent, and

---

test—whether a mineral can be "extracted, removed and marketed at a profit"—deeming it a logical complement of the prudent-man standard.

particularly with *Freeman* v. *Summers;* but it rejected that precedent as inconsistent with the general mining law and therefore unsound. The Board then considered whether its newly enunciated interpretation should be given only prospective effect. It found that respondents' reliance on prior rulings was minimal and that the Department's responsibility as trustee of public lands required it to correct a plainly erroneous decision.[5] Accordingly, it ruled that its new interpretation applied to the Mountain Boys and Shoup claims, and that those claims were invalid.

Respondents appealed the Board's ruling to the United States District Court for the District of Colorado. The District Court agreed with the Board that by not requiring proof of "present marketability" the decision in *Freeman* v. *Summers* had liberalized the traditional valuable mineral test. But it found that Congress in 1931 and again in 1956 had considered the patentability of oil shale and had implicitly "ratified" that liberalized rule. Alternatively, the District Court concluded that the Department was estopped now from departing from the *Freeman* standard which investors had "relied upon . . . for the past half-century." *Shell Oil Co.* v. *Kleppe*, 426 F. Supp. 894, 907 (1977). On these grounds, it reversed the Board's ruling and held that the claims at issue were valid.

The Court of Appeals for the Tenth Circuit affirmed. 591 F. 2d 597 (1979). It agreed with the District Court that the "different treatment afforded all oil shale claims as to the 'valuable mineral deposit' element of a location became a part of the general mining laws by reason of its adoption and ap-

---

[5] The Board observed that "[a]lthough Shell . . . expended some $18,780 in perfecting title to and preparing patent application for the Mountain Boy claims before 1964, it did not purchase [the claims] from Frank Winegar for $30,000 [until] after initiation of the contest proceedings." And it found no evidence that D. A. Shale, Inc., or its predecessors had invested "more than a minimal amount" in the purchase of the Shoup claims in reliance on the *Freeman* decision.

proval by both Houses of Congress" in the years after 1920. *Id.,* at 604. And it held that the Department now must adhere to the *Freeman* rule. We granted certiorari because of the importance of the question to the management of the public lands. 444 U. S. 822 (1979). We affirm.

## II

The legislative history of the 1920 Mineral Leasing Act shows that Congress did not consider "present marketability" a prerequisite to the patentability of oil shale.[6] In the extensive hearings and debates that preceded the passage of the 1920 Act, there is no intimation that Congress contemplated such a requirement; indeed, the contrary appears. During the 1919 floor debates in the House of Representatives, an amendment was proposed which would have substituted the phrase "deposits in paying quantities" for "valuable mineral." That amendment, however, was promptly withdrawn after Mr. Sinott, the House floor manager, voiced his objection to the change:

> "Mr. SINOTT. That language was put in with a great deal of consideration and we would not like to change from 'valuable' to 'paying.' *There is quite a distinction.* We are in line with the decisions of the courts as to what is a discovery, and I think it would be a very

---

[6] Congress was aware that there was then no commercially feasible method for extracting oil from oil shale. The 1918 Report of the House Committee on the Public Lands, for example, had emphasized that

"no commercial quantity or any appreciable amount of shale oil has ever been produced in this country, nor any standardized process of production has yet been evolved or recommended or agreed upon in this country by the Bureau of Mines or anyone else, and it has not yet been demonstrated that the oil-shale industry can be made commercially profitable. . . ." H. R. Rep. No. 563, 65th Cong., 2d Sess., 18 (1918).

See also 58 Cong. Rec. 4271, 4279 (1919) (remarks of Sen. Smoot); Hearings on H. R. 3232 and S. 2812 before the House Committee on the Public Lands, 65th Cong., 2d Sess., 811, 890, 1257 (1918) (hereafter Hearings).

dangerous matter to experiment with this language at this time." 58 Cong. Rec. 7537 (1919) (emphasis added).

An examination of the relevant decisions at the time underscores the point. Those decisions are clear in rejecting a requirement that a miner must "demonstrat[e] that the vein . . . would pay all the expenses of removing, extracting, crushing, and reducing the ore, and leave a profit to the owner," *Book* v. *Justice Mining Co.,* 58 F. 106, 124 (CC Nev. 1893), and in holding that "it is enough if the vein or deposit 'has a present *or prospective* commercial value.'" *Madison* v. *Octave Oil Co.,* 154 Cal. 768, 772, 99 P. 176, 178 (1908) (emphasis added). Accord, *Cascaden* v. *Bartolis,* 146 F. 739 (CA9 1906); *United States* v. *Ohio Oil Co.,* 240 F. 996, 998 (Wyo. 1916); *Montana Cent. R. Co.* v. *Migeon,* 68 F. 811, 814 (CC Mont. 1895); *East Tintic Consolidated Mining Co.,* 43 L. D. 79, 81 (1914); 2 C. Lindley, American Law Relating to Mines and Mineral Lands § 336, pp. 768–769 (3d ed. 1914). See generally Reeves, The Origin and Development of the Rules of Discovery, 8 Land & Water L. Rev. 1 (1973).

To be sure, prior to the passage of the 1920 Act, there existed considerable uncertainty as to whether oil shale was patentable.[7] That uncertainty, however, related to whether oil shale was a "mineral" under the mining law, and not to its "value." Similar doubts had arisen in the late 19th cen-

---

[7] Mr. John Fry, one of the Committee witnesses who represented the oil shale interests before Congress, was candid on that point:

"Mr. TAYLOR. There is a large amount of this shale land that has been located and is now held under the placer law. But none of it has yet gone to patent.

"The Chairman. Has one acre of this land withdrawn in Colorado been patented?

"Mr. FRY. No.

"The Chairman. So you do not know what the holding of the department will be?

"Mr. FRY. We do not." Hearings, at 912.

See also *id.,* at 626, 873, 913, 918, 1240, 1256–1257.

tury in regard to petroleum. Indeed, in 1896 the Secretary of the Interior had held that petroleum claims were not subject to location under the mining laws, concluding that only lands "containing the more precious metals . . . gold, silver, cinnabar etc." were open to entry. *Union Oil Co.*, 23 L. D. 222, 227. The Secretary's decision was short-lived. In 1897, Congress enacted the Oil Placer Act authorizing entry under the mining laws to public lands "containing petroleum or other mineral oils." Ch. 216, 29 Stat. 526. This legislation put to rest any doubt about oil as a mineral. But because oil shale, strictly speaking, contained kerogen and not oil, see n. 3, *supra*, its status remained problematic. See Reidy, Do Unpatented Oil Shale Claims Exist?, 43 Denver L. J. 9, 12 (1966).

That this was the nature of the uncertainty surrounding the patentability of oil shale claims is evident from remarks made throughout the hearings and debates on the 1920 Act. In the 1918 hearings, Congressman Barnett, for example, explained:

> "Mr. BARNETT. . . . If the department should contend that shale lands come within the meaning of the term 'oil lands' they must perforce, by the same argument, admit that they are placer lands within the meaning of the act of 1897.
>
> "The Chairman. And patentable?
>
> "Mr. BARNETT. And patentable under that act." Hearings, at 918.

The enactment of the 1920 Mineral Leasing Act put an end to these doubts. By withdrawing "oil shale . . . in lands valuable for such minerals" from disposition under the general mining law, the Congress recognized—at least implicitly— that oil shale *had been* a locatable mineral. In effect, the 1920 Act did for oil shale what the 1897 Oil Placer Act had done for oil. And, as Congressman Barnett's ready answer demonstrates, once it was settled that oil shale was a mineral

subject to location, and once a savings clause was in place preserving pre-existing claims, it was fully expected that such claims would be patentable. The fact that oil shale then had no commercial value simply was not perceived as an obstacle to that end.

## III

Our conclusion that Congress in enacting the 1920 Mineral Leasing Act contemplated that pre-existing oil shale claims could satisfy the discovery requirement of the mining law is confirmed by actions taken in subsequent years by the Interior Department and the Congress.[8]

### A

On May 10, 1920, less than three months after the Mineral Leasing Act became law, the Interior Department issued "Instructions" to its General Land Office authorizing that Office to begin adjudicating applications for patents for pre-1920 oil shale claims. The Instructions advised as follows:

> "Oil shale having been thus recognized by the Department and *by Congress* as a *mineral* deposit and a source of petroleum . . . lands valuable on account thereof *must be held to have been subject to valid location and*

---

[8] This Court has observed that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States* v. *Price,* 361 U. S. 304, 313 (1960). This sound admonition has guided several of our recent decisions. See, *e. g , TVA* v. *Hill,* 437 U. S. 153, 189–193 (1978); *SEC* v. *Sloan,* 436 U. S. 103, 119–122 (1978). Yet we cannot fail to note Mr. Chief Justice Marshall's dictum that "[w]here the mind labours to discover the design of the legislature, it seizes every thing from which aid can be derived." *United States* v. *Fisher,* 2 Cranch 358, 386 (1805). In consequence, while arguments predicated upon subsequent congressional actions must be weighed with extreme care, they should not be rejected out of hand as a source that a court may consider in the search for legislative intent. See, *e. g., Seatrain Shipbuilding Corp.* v. *Shell Oil Co.,* 444 U. S. 572, 596 (1980); *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 380–381 (1969); *NLRB* v. *Bell Aerospace Co.,* 416 U. S. 267, 274–275 (1974).

*appropriation under the placer mining laws,* to the same extent and subject to the same provisions and conditions as if valuable on account of oil or gas." 47 L. D. 548, 551 (1920) (emphasis added).

The first such patent was issued immediately thereafter. Five years later, the Department ruled that patentability was dependent upon the "character, extent, and mode of occurrence of the oil-shale deposits." *Dennis* v. *Utah,* 51 L. D. 229, 232 (1925). Present profitability was not mentioned as a relevant, let alone a critical, consideration.

In 1927, the Department decided *Freeman* v. *Summers,* 52 L. D. 201. The case arose out of a dispute between an oil shale claimant and an applicant for a homestead patent, and involved two distinct issues: (1) whether a finding of lean surface deposits warranted the geological inference that the claim contained rich "valuable" deposits below; and (2) whether present profitability was a prerequisite to patentability. Both issues were decided in favor of the oil shale claimant: the geological inference was deemed sound and the fact that there was "no possible doubt . . . that [oil shale] constitutes an enormously valuable resource for future use by the American people" was ruled sufficient proof of "value." *Id.,* at 206.

For the next 33 years, *Freeman* was applied without deviation.[9] It was said that its application ensured that "valid rights [would] be protected and permitted to be perfected." Secretary of Interior Ann. Rep. 30 (1927). In all, 523 patents for 2,326 claims covering 349,088 acres were issued under the *Freeman* rule. This administrative practice, begun immediately upon the passage of the 1920 Act, "has peculiar weight [because] it involves a contemporaneous con-

---

[9] See, *e. g., John M. Debevoise,* 67 I. D. 177, 180 (1960); *United States* v. *Strauss,* 59 I. D. 129, 140–142 (1945); *Location of Oil Shale Placer Claims,* 52 L. D. 631 (1929); *Assessment Work on Oil-Shale Claims,* 52 L. D. 334 (1928); *Standard Shales Products Co.,* 52 L. D. 522 (1928); *James W. Bell,* 52 L. D. 197 (1927).

struction of [the] statute by the men charged with the responsibility of setting its machinery in motion," *Norwegian Nitrogen Products Co.* v. *United States,* 288 U. S. 294, 315 (1933). Accord, *e. g., United States* v. *National Assn. of Securities Dealers,* 422 U. S. 694, 719 (1975); *Udall* v. *Tallman,* 380 U. S. 1, 16 (1965). It provides strong support for the conclusion that Congress did not intend to impose a present marketability requirement on oil shale claims.

## B

In 1930 and 1931, congressional committees revisited the 1920 Mineral Leasing Act and re-examined the patentability of oil shale claims. Congressional interest in the subject was sparked in large measure by a series of newspaper articles charging that oil shale lands had been "improvidently, erroneously, and unlawfully, if not corruptly, transferred to individuals and private corporations." 74 Cong. Rec. 1079 (1930) (S. Res. 379). The articles were based upon accusations leveled at the Interior Department by Ralph S. Kelly, then the General Land Office Division Inspector in Denver. Kelly's criticism centered on the *Freeman* v. *Summers* decision. Fearing another "Teapot Dome" scandal, the Senate authorized the Committee on Public Lands to "inquire into . . . the alienation of oil shale lands."

The Senate Committee held seven days of hearings focusing almost exclusively on "the so-called Freeman-Summers case." Hearings on S. Res. 379 before the Senate Committee on Public Lands and Surveys, 71st Cong., 3d Sess., 2 (1931). At the outset of the hearings, the Committee was advised by E. C. Finney, Solicitor, Department of the Interior, that 124 oil shale patents had been issued covering 175,000 acres of land and that 63 more patent applications were pending. Finney's statement prompted this interchange:

> "Senator PITTMAN: Well, were the shales on those patented lands of commercial value?

"Mr. FINNEY: If you mean by that whether they could have been mined and disposed of at a profit at the time of the patent, or now, the answer is no.

. . . . .

"Senator PITTMAN: So the Government has disposed of 175,000 acres in patents on lands which in your opinion there was no valid claim to in the locator?

"Mr. FINNEY: No; that was not my opinion. I have never held in the world, that I know of, that you had to have an actual commercial discovery of any commodity that you could take out *and market at a profit.* On the contrary, the department has held that that is not the case. . . ." *Id.,* at 25 (emphasis added).

Later in the hearings Senator Walsh expressed his understanding of the impact of the *Freeman* decision:

"Senator WALSH: [It means] . . . that the prospector having found at the surface the layer containing any quantity of mineral, that is of oil-bearing shale or kerogen, that that would be a discovery in view of the beds down below of richer character.

"Mr. FINNEY: In this formation, yes sir; that is correct." *Id.,* at 138.

See also *id.,* at 22–23, 26, 163. The Senate Committee did not produce a report. But one month after the hearings were completed, Senator Nye, the Chairman of the Committee, wrote the Secretary of the Interior that he had " 'conferred with Senator Walsh and beg[ged] to advise that there is no reason why your Department should not proceed to final disposition of the pending application for patents to oil shale lands in conformity with the law.' " App. 103. The patenting of oil shale lands under the standards enunciated in *Freeman* was at once resumed.

At virtually the same time, the House of Representatives commenced its own investigation into problems relating to

oil shale patents. The House Committee, however, focused primarily on the question of assessment work—whether an oil shale claimant was required to perform $100 work per year or forfeit his claim—and not on discovery. But the impact of the *Freeman* rule was not lost on the Committee:

"Mr. SWING. In furtherance of the policy of conservation, Mr. Secretary, in view of the fact that there has not been discovered, as I understand it, any practical economical method of extracting oil from the shale in competition with oil wells . . . would it not be proper public policy to withdraw all shale lands from private acquisition, since we are compelled to recognize, perforce, economic and fiscal conditions, that no one is going to make any beneficial use of the oil shale in the immediate future, but is simply putting it in cold storage as a speculative proposition?

"Secretary WILBUR: As a matter of conservation, what you say is true, but what we have to meet here is the fact that in the leasing act there was a clause to the effect that valid existing claims were not included, and so we are dealing with claims that are thought to be valid, and the question—

"Mr. SWING (interposing). I realize that, and I understand the feeling of Congress, and I think generally the country, that in drawing the law we do not want to cut the ground from under the person who has initiated a right." Consolidated Hearings on Applications for Patent on Oil Shale Lands before the House Committee on the Public Lands, 71st Cong., 3d Sess., 100 (1931).[10]

---

[10] At the conclusion of its hearings, the Committee recommended legislation placing a deadline on the filing of patent applications for oil shale claims and permitting an oil shale claimant to pay $100 a year to the Land Office in lieu of $100 in annual assessment work. Other aspects of the oil shale patentability—including the question of discovery—were

Congressman Swing's statement of the "feeling of Congress" comports with our reading of the 1920 statute and of congressional intent. To hold now that *Freeman* was wrongly decided would be wholly inconsistent with that intent. Moreover, it would require us to conclude that the Congress in 1930–1931 closed its eyes to a major perversion of the mining laws. We reject any such conclusion.

## C

In 1956 Congress again turned its attention to the patentability of oil shale. That year it amended the mining laws by eliminating the requirement that locators must obtain and convey to the United States existing homestead surface-land patents in order to qualify for a mining patent on minerals withdrawn under the 1920 Mineral Leasing Act. See Pub. L. 743, 70 Stat. 592. Where a surface owner refused to cooperate with the mining claimant and sell his estate, this requirement prevented the mining claimant from patenting his claim. See *James W. Bell*, 52 L. D. 197 (1927). In hearings on the amendment, it was emphasized that oil shale claimants would be principal beneficiaries of the amendment:

> "Mr. ASPINALL. This [bill] does not have to do with any other minerals except the leaseable minerals to which no one can get a patent since 1920. . . . As far as I know, there are only just a few cases that are involved, and most of those cases are in the oil shale lands of eastern Utah and western Colorado. That is all this bill refers to." Hearings on H. R. 6501 before the House Committee on Interior and Insular Affairs 3–4 (1956).

See also Hearings on H. R. 6501 before the Subcommittee on Mines and Mining of the House Committee on Interior and

---

not addressed in the proposed legislation. H. R. Rep. No. 2537, 71st Cong., 3d Sess. (1931). The proposal was not enacted by the Congress.

Insular Affairs 4, 13–14, 16 (1956). The Reports of both Houses also evince a clear understanding that oil shale claimants stood to gain by the amendment:

"Under the Department of the Interior decision in the case of James W. Bell . . . the owner of a valid mining claim located before February 25, 1920, on lands covered by the 1914 act, in order to obtain a patent to the minerals, is required to acquire the outstanding interest of the surface owner and thereafter to execute a deed of reconveyance to the United States. . . . From 1946 to 1955, inclusive, 71 mining claims, *including 67 oil shale claims,* were issued under this procedure. The committee is informed that in a few cases mining claimants have been unable to obtain the cooperation of the owners of the surface estate and have been prevented thereby from obtaining patent to the mineral estate." S. Rep. No. 2524, 84th Cong , 2d Sess., 2 (1956); H. R. Rep. No. 2198, 84th Cong., 2d Sess., 2 (1956) (emphasis added).

The bill was enacted into law without floor debate. Were we to hold today that oil shale is a nonvaluable mineral we would virtually nullify this 1956 action of Congress.

## IV

The position of the Government in this case is not without a certain irony. Its challenge to respondents' pre-1920 oil shale claims as a "nonvaluable" comes at a time when the value of such claims has increased sharply as the Nation searches for alternative energy sources to meet its pressing needs. If the Government were to succeed in invalidating old claims and in leasing the lands at public auction, the Treasury, no doubt, would be substantially enriched. However, the history of the 1920 Mineral Leasing Act and developments subsequent to that Act persuade us that the Government cannot achieve that end by imposing a present marketability

requirement on oil shale claims.[11]  We conclude that the original position of the Department of the Interior, enunciated in the 1920 Instructions and in *Freeman* v. *Summers,* is the correct view of the Mineral Leasing Act as it applies to the patentability of those claims.[12]

The judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE STEWART, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

Oil shale was patentable under the general mining law from

[11] This history indicates only that a present marketability standard does not apply to oil shale.  It does not affect our conclusion in *United States* v. *Coleman* that for other minerals the Interior Department's profitability test is a permissible interpretation of the "valuable mineral" requirement. See n. 4, *supra.*

[12] The dissent overlooks the abundant evidence that Congress since 1920 has consistently viewed oil shale as a "valuable mineral" under the general mining law.  The dissent dismisses the 1931 hearings and the 1956 Act as irrelevancies: as for the 1931 hearings, the dissent states that "not a single remark by a Senator or Representative" approved the *Freeman* standard; as for the 1956 Act, we are informed that Congress "dealt with [a] totally unrelated problem."  *Post,* at 676.  Neither of these observations is correct.  The 1931 Senate hearings were called specifically to review the *Freeman* case for fear that another "Teapot Dome" scandal was brewing.  Rarely has an administrative law decision received such exhaustive congressional scrutiny.  And following that scrutiny, no action was taken to disturb the settled administrative practice; rather Senator Nye advised the Interior Department to continue patenting oil shale claims.  Similarly, to characterize the 1956 Act as "totally unrelated" is to blink reality.  The patentability of oil shale land was an essential predicate to that legislation; if oil shale land was nonpatentable then Congress performed a useless act.

The dissent also overlooks that beginning in 1920 and continuing for four decades, the Interior Department treated oil shale as a "valuable mineral."  In paying deference to the doctrine that a "contemporaneous [administrative] construction . . . is entitled to substantial weight," *post,* at 676, the dissent ignores this contemporaneous administrative practice. The best evidence of the 1920 standard of patentability is the 1920 In-

1872 until 1920.[1]  In 1920, Congress enacted the Mineral Leasing Act, 30 U. S. C. § 181 *et seq.*  That legislation withdrew oil shale and certain other minerals from the general mining law, but preserved "valid claims existent at date of the passage of this Act and thereafter maintained in compliance with the laws under which initiated, which claims may be perfected under such laws, including discovery."  Act of Feb. 25, 1920, ch. 85, § 37, 41 Stat. 451, as amended, 30 U. S. C. § 193.

The question presented in this case is whether oil shale claims brought under this saving clause of the Mineral Leasing Act must satisfy the usual standards of patentability, or instead may be patented through the use of a "discovery" standard different from that which generally applies.  The Court's answer is that a different and more relaxed standard is applicable.  I disagree.  Since I believe that pre-1920 oil shale claims must fulfill the then firmly established requirements of patentability for all valuable minerals under the general mining law, I respectfully dissent from the opinion and judgment of the Court.

## A

There is not one shred of evidence that Congress enacted the saving clause of the Mineral Leasing Act with the purpose of exempting oil shale claims from the usual requirements of patentability.  On its face, the 1920 version of the

---

terior Department practice on the matter.  The suggestion of the dissent that "future events [such] as market changes" were not meaningful data under the *Castle* v. *Womble* test, *post,* at 678, is inaccurate.  As a leading treatise has observed, "[t]he future value concept of *Freeman* v. *Summers* is nothing more than the 'reasonable prospect of success' of *Castle* v. *Womble,* and the reference to 'present facts' in *Castle* v. *Womble . . .* relates to the existence of a vein or lode and not to its value."  1 Rocky Mountain Mineral Law Foundation, The American Law of Mining § 4.76, p. 697, n. 2 (1979).

[1] Rev. Stat. § 2319 *et seq.,* as amended, 30 U. S. C. § 22 *et seq.*  See *Union Oil Co.* v. *Smith,* 249 U. S. 337, 345–346.

provision applied with identical effect to "coal, phosphate, sodium, oil, oil shale, and gas," and required that all outstanding valid claims to such minerals meet the existing standards of the mining law in order to be perfected.

Nothing in the Act's legislative history suggests anything to the contrary. Descriptions by legislators of the saving clause drew no distinction between oil shale and other covered claims. See, e. g., 59 Cong. Rec. 2711–2712 (1920) (Rep. Taylor); 58 Cong. Rec. 7780–7781 (1919).[2] In the face of conflicting evidence on the subject, Congress may well have thought that many oil shale claims would meet the traditional criteria of patentability. But it did not accord such claims any special legislative treatment.

Equally unambiguous are the Instructions which the Secretary of the Interior published three months after passage of the Act. These expressly stated:

> "[L]ands valuable on account [of oil shale] must be held to have been subject to valid location and appropriation under the placer mining laws, *to the same extent and subject to the same provisions and conditions as if valuable on account of oil or gas.* Entries and applications for patent for oil shale placer claims will, therefore, be adjudicated . . . in accordance *with the same legal provisions and with reference to the same requirements and limitations as are applicable to oil and gas placers."* 47 L. D. 548, 551 (1920) (emphasis added).

---

[2] The Court's discussion of a 1919 attempt to substitute "deposits in paying quantities" for "valuable mineral" in a provision of the prospective Mineral Leasing Act, and Representative Sinott's response thereto, see *ante,* at 663–664, has absolutely nothing to do with the issue at hand. The attempted substitution concerned a provision of the prospective Act that set out the circumstances under which exploratory permits would be allowed for oil and gas deposits under the new leasing scheme. See 58 Cong. Rec. 7536–7537 (1919). Thus, the legislative discussion quoted by the Court did not involve oil shale, the requirements of the general mining law, or the Act's saving clause. See *id.,* at 7780–7781.

Such a contemporaneous construction of the statute by the agency charged with its application is entitled to substantial weight. See *United States* v. *National Assn. of Securities Dealers,* 422 U. S. 694, 719; *Udall* v. *Tallman,* 380 U. S. 1, 16.

## B

The saving clause of the Mineral Leasing Act thus directs that the validity of all claims brought thereunder—including those relating to oil shale—must be judged according to the general criteria of patentability that were established in the mining law as of 1920. And I am convinced that nothing that Congress has done since 1920 can be read to have modified this mandate.

The Court points to congressional committee hearings that were held in 1931 on the Secretary's 1927 *Freeman* v. *Summers* decision, and notes that there resulted from this inquiry no legislative rejection of the Department's then prevailing generous treatment of oil shale claims. But of far greater significance, in my opinion, is the fact that not a single remark by a Senator or Representative, let alone by a congressional committee, can be found approving the liberal standard enunciated in *Freeman* v. *Summers,* 52 L. D. 201, even though such a statement could not, in any event, have overridden the plain meaning of the saving clause of the Mineral Leasing Act. See *TVA* v. *Hill,* 437 U. S. 153, 191–193; *SEC* v. *Sloan,* 436 U. S. 103, 121.

The Court purports to find support for its position in legislation enacted by Congress in 1956. But that legislation dealt with the totally unrelated problem of competing surface and mineral estates, and has nothing to do with the question at issue here. See Pub. L. 743, 70 Stat. 592; S. Rep. No. 2524, 84th Cong., 2d Sess. (1956); H. R. Rep. No. 2198, 84th Cong., 2d Sess. (1956).

The only reasonable inference that can be drawn from the events of 1931 and 1956 is that on those two occasions, as in 1920, Congress declined to assume that every pre-1920 oil

shale claim would turn out to be unpatentable. It seems to me wholly fallacious to interpret these indications of caution as a congressional intent to exempt oil shale claims from longstanding principles of patentability.

## C

The respondents' patent applications were, I think, quite properly rejected at the administrative level for the simple reason that they failed to satisfy the requirements of the general mining law as of 1920. By 1920, the law, was clear that a mineral land patent could issue only when the applicant had made a "discovery" of a "valuable mineral deposit." *Union Oil Co.* v. *Smith,* 249 U. S. 337, 346 (1919). Through departmental and judicial decisions, it had been further established that a "discovery" occurs only when minerals are found in such quantity and quality as to justify a prudent man to expend his labor and means with a reasonable prospect of success in developing a valuable mine. *Chrisman* v. *Miller,* 197 U. S. 313, 321–323 (1905); *H. H. Yard,* 38 L. D. 59, 70 (1909); *Castle* v. *Womble,* 19 L. D. 455, 457 (1894). See *Cameron* v. *United States,* 252 U. S. 450, 459 (1920); *Casey* v. *Northern Pacific R. Co.,* 15 L. D. 439, 440 (1892).

Of controlling significance here is the fact that, by 1920, two refinements of this "prudent man test" had occurred. First, it was clear that, although the patent applicant did not have to demonstrate that his mining efforts would definitely yield some profit,[3] he at least had to show that they probably would. *Cataract Gold Mining Co.,* 43 L. D. 248, 254 (1914). See *Cole* v. *Ralph,* 252 U. S. 286, 299 (1920); *Cameron* v. *United States, supra,* at 459; *United States* v. *Iron Silver Mining Co.,* 128 U. S. 673, 684 (1884).[4] Second,

---

[3] See *East Tintic Consolidated Mining Co.,* 43 L. D. 79, 81–82 (1914).

[4] See also *Royal K. Placer,* 13 L. D. 86, 89–90 (1891); *Tinkham* v. *McCaffrey,* 13 L. D. 517, 518 (1891). The authorities cited by the Court, *ante,* at 664, do not support a contrary rule. They state that an applicant

this required showing of probable profitability had to rest primarily on presently demonstrable, not speculative, fact. See *Davis's Administrator* v. *Weibbold,* 139 U. S. 507, 521–524 (1891); *Castle* v. *Womble, supra,* at 457 ("the requirement relating to discovery refers to present facts, and not to the probabilities of the future"); *Casey* v. *Northern Pacific R. Co., supra,* at 440; *Winters* v. *Bliss,* 14 L. D. 59, 62 (1892). Thus, the applicant could not satisfy the applicable standard by pointing to such highly uncertain future events as market changes or technological advances in an attempt to demonstrate a reasonable prospect of success.

Each of these principles had developed rather naturally out of the "prudent man" rule of *Castle* v. *Womble, supra.* For land to be deemed "valuable" for mining purposes, and for a prudent man to decide to expend his time and money in developing a mine upon that land, it was quite rational to require a showing of a reasonable prospect that the mine would yield a profit. See *Cataract Gold Mining Co., supra,* at 254. The Court is simply mistaken in suggesting that the general mining law was in any way otherwise in 1920.

## D

With respect to the oil shale deposits at issue in this case, the Board of Land Appeals found that they "never have been a valuable mineral deposit within the meaning of the general

for a mineral patent need not establish with certainty that a paying mine exists or can be developed on his land, but they do not in any way reject the rule of *Castle* v. *Womble,* 19 L. D. 455, 457 (1894), that the applicant must show that there exists a "reasonable prospect of success" in his developing a profitable mine. See *Cascaden* v. *Bartolis,* 146 F. 739, 741–742 (CA9 1906); *United States* v. *Ohio Oil Co.,* 240 F. 996, 998–1004 (Wyo. 1916); *Montana Cent. R. Co.* v. *Migeon,* 68 F. 811, 814–818 (CC Mont. 1895); *Book* v. *Justice Mining Co.,* 58 F. 106, 120, 123–125 (CC Nev. 1893); *Madison* v. *Octave Oil Co.,* 154 Cal. 768, 771–772, 99 P. 176, 178 (1908); 2 C. Lindley, American Law Relating to Mines and Mineral Lands § 336, pp. 768–773 (3d ed. 1914).

mining law." The Board based this conclusion on the follow-
ing factual findings:

"First, as a historical fact, the commercial production
of oil from oil shale has never been competitive with the
liquid petroleum industry. Second, the hypothetical
studies [in the record] at best confirm that the commer-
cial exploitation of oil shale would not be competitive
with the liquid petroleum industry. Third, without ex-
ception, every oil shale operation that has been attempted
in this country has failed to show profitable production.
Fourth, [the respondents] have held these claims for half
a century without attempting to exploit them.

"It is unlikely that any oil shale operation could have
operated at a profit at the time these claims were located
or at any time up to and including the time of these con-
test proceedings. . . .

.            .            .            .            .

"In order for a commercially profitable operation to
come into being there must be either a dramatic improve-
ment in the technology or an alteration of the economic
forces which have always operated in this country to
prevent the commercial production of oil shale."

The Court of Appeals seemed to acknowledge that these
findings were supported by substantial evidence, 591 F. 2d
597, 598–599, but thought that a different standard of patent-
ability is applicable to oil shale claims, and today this Court
agrees with that view.

For the reasons stated, I do not agree. Accordingly, I
would set aside the judgment of the Court of Appeals.