720 F.2d 571
 Charles E. SCHWENKE, Lester Earl Nickels, and Russell K.
Nickels, Plaintiffs-Appellees,
v.
SECRETARY OF THE INTERIOR, Director of the Fish and Wildlife
Service and Refuge Manager of the Charles M.
Russell National Wildlife Refuge,
Defendant-Appellant,
and
National Wildlife Federation, Montana Wildlife Federation,
Defendants-Intervenors-Appellants.
 Nos. 82-3132, 82-3175.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 3, 1983.
Decided Oct. 14, 1983.
 
 C. Delos Putz, Jr., San Francisco, Cal., for plaintiffs-appellees.
 Thomas France, Missoula, Mont., Thomas H. Pacheco, Dept. of Justice, Washington, D.C., for defendant-appellant.
 Appeal from the United States District Court for the District of Montana.
 Before FERGUSON, BOOCHEVER and NORRIS, Circuit Judges.
 NORRIS, Circuit Judge.
 
 
 1
 This case involves a series of executive orders and statutes dealing with livestock grazing and wildlife preservation on the Charles M. Russell National Wildlife Range (Russell Range or Range), an area of approximately 823,456 acres in northeastern Montana owned by the United States. We are called upon first to decide the relative priorities of wildlife and livestock in access to the natural forage resources of the Range. Second, we must decide whether livestock grazing on the Russell Range is to be administered under the Taylor Grazing Act or the National Wildlife Refuge System Administration Act (Wildlife Refuge Act).
 
 
 2
 * Plaintiffs are ranchers holding permits for grazing on the Russell Range. They brought this action against the Secretary of the Interior and officials of the Department of the Interior's Fish and Wildlife Service seeking a declaratory judgment that livestock grazing on the Russell Range should be administered under the Taylor Grazing Act, rather than the Wildlife Refuge Act, as a use entitled to equal status with wildlife preservation, and that the Fish and Wildlife Service had unlawfully subordinated livestock grazing on the Russell Range to wildlife protection.
 
 
 3
 The district court granted partial summary judgment in favor of the ranchers,[1] holding that livestock grazing and wildlife conservation are of coequal priority and that grazing is to be administered under the Taylor Grazing Act. On appeal, the Secretary argues that the land constituting the Russell Range was set aside by the government in 1936 primarily for wildlife preservation and that livestock grazing was to be only an incidental use. Alternatively, the Secretary argues that if the government ever intended to accord livestock grazing and wildlife protection equal status, Congress changed that priority scheme by legislation passed in 1976. Finally, the Secretary contends that legislation passed by Congress in 1976 mandates that grazing on the Russell Range be administered under the Wildlife Refuge Act, not the Taylor Grazing Act.
 
 II
 
 4
 The first important legislation dealing with livestock grazing in the Western States was the Taylor Grazing Act, ch. 865, 48 Stat. 1269 (codified as amended at 43 U.S.C. Sec. 315 (Supp. V 1981)), enacted in 1934. The Act authorized the Secretary of the Interior "in his discretion, by order to establish grazing districts ... [on public lands], which ... in his opinion are chiefly valuable for grazing and raising forage crops." 43 U.S.C. Sec. 315. The Act also established a system for administering the grazing districts, through the issuance of grazing permits and the collection of grazing fees. Shortly after passage of the Act, several grazing districts were created under the Taylor Grazing Act, including districts on the land that later became the Russell Range.[2]
 
 
 5
 In 1936, two years after passage of the Taylor Grazing Act, President Roosevelt issued Executive Order No. 7509, 3 C.F.R. 227 (1936). That order contained several important provisions. First, it created the Fort Peck Game Range on the land that is now the Charles M. Russell Range and ordered that the Range was to be "withdrawn from settlement, location, sale or entry and reserved and set apart for the conservation and development of natural wildlife resources and for the protection and improvement of public grazing land and natural forage resources." Id.
 
 
 6
 Second, E.O. 7509 directed that conservation and development of wildlife on the Range were to be under the joint jurisdiction of the Secretary of the Interior and the Secretary of Agriculture and that grazing and natural forage resources on the Range were to be under the sole jurisdiction of the Secretary of the Interior.[3]
 
 
 7
 Third, the order specifically provided for a wildlife use. Since it is this part of E.O. 7509 that is at the heart of the present controversy, we set it out in full:
 
 
 8
 [T]he natural forage resources [on the Range] shall be first utilized for the purpose of sustaining in a healthy condition a maximum of four hundred thousand (400,000) sharptail grouse, and one thousand five hundred (1,500) antelope, the primary species, and such nonpredatory secondary species in such numbers as may be necessary to maintain a balanced wildlife population, but in no case shall the consumption of forage by the combined population of the wildlife species be allowed to increase the burden of the range dedicated to the primary species.
 
 Id. at 228
 
 9
 Finally, the order provided that "all the forage resources within this range or preserve shall be available, except as herein otherwise provided with respect to wildlife, for domestic livestock" under rules and regulations promulgated by the Secretary of the Interior under the authority of the Taylor Grazing Act. Id.
 
 
 10
 E.O. 7509 can be read in several ways. It is possible, as the Secretary argues, to read the order as establishing an absolute priority for wildlife over livestock. E.O. 7509 specifically provides that "the natural forage resources [of the Russell Range] shall be first utilized" for the purpose of maintaining primary and nonpredatory secondary species of wildlife in such numbers as necessary to maintain a balanced wildlife population. While forage resources within the Range are available for livestock grazing, they are available "except as ... otherwise provided [in the order] with respect to wildlife." The "first utilized" language applies to (1) primary species; (2) secondary species; and (3) a balanced wildlife population. It is not unreasonable to argue that the numbers set out in the order establish priority among types of wildlife and that the first utilized language, referring as it does to both "primary" and "secondary species," establishes an absolute priority for wildlife over livestock.
 
 
 11
 It is also possible to read E.O. 7509, as do the ranchers, as making no distinction between wildlife and livestock in terms of access to the resources of the Range. The preamble to E.O. 7509 provides that the Range is withdrawn from settlement and sale "for the conservation and development of natural wildlife resources and for the protection and improvement of public grazing lands and natural forage resources." Id. at 227. This passage, at least, does not distinguish between wildlife and livestock. Moreover, it is undisputed that from 1936 until 1976, the Bureau of Land Management and the Fish and Wildlife Service administered the Russell Range on the premise that wildlife and livestock had equal priority in access to the resources of the Range.
 
 
 12
 Neither the ranchers' nor the Secretary's position, however, is ultimately convincing. The ranchers' position--that grazing and wildlife preservation enjoy equal status on the Range--altogether ignores the language commanding that the resources of the Range shall be "first utilized" for the support of certain types of wildlife. The argument of the Secretary--that wildlife has absolute priority on the Range--ignores forty years of administration of the Range by the Fish and Wildlife Service and the Bureau of Land Management.[4] It also ignores the language of the order itself. E.O. 7509 refers to a "maximum " of 400,000 sharptail grouse and 1500 antelope. Had an absolute wildlife priority been intended, it is hard to see why such limits were established. Moreover, the last portion of E.O. 7509 provides that land
 
 
 13
 acquired and to be acquired by the United States for the use of the Department of Agriculture for the conservation of migratory birds and other wildlife, shall be and remain under the exclusive administration of the Secretary of Agriculture and may be utilized for public grazing purposes only to such extent as may be determined by the said Secretary to be compatible with the utilization of said lands for the purposes for which they were acquired as aforesaid under regulations prescribed by him.
 
 
 14
 Id. at 228. This language clearly established an absolute priority for wildlife on any lands that may be acquired by the Department of Agriculture for conservation of birds and wildlife. If such a priority had been intended on the entire Range, we would expect similarly explicit language to have been employed. Finally, if an absolute priority for wildlife had been intended on the entire Range there would have been no need then to carve out a priority for wildlife on particular parts of the Range.
 
 
 15
 We therefore reject both of these extreme positions. We instead are persuaded by an intermediate position that seems to us to represent a fairer reading of E.O. 7509 than that advanced by either the ranchers or the Secretary. We believe E.O. 7509 establishes a limited priority for wildlife beyond which grazing and wildlife preservation have equal status. It is clear that some priority for wildlife was intended. E.O. 7509 specifically provides that the resources of the Range shall be "first utilized" to support the primary and secondary species. It is equally clear, however, that that priority was limited. The order provides that the Range shall be first utilized for wildlife up to a maximum of 400,000 sharptail grouse, 1500 antelope, and that number of secondary species necessary to maintain a balanced wildlife population. We thus hold that E.O. 7509 established a priority in access to the forage resources of the Range for, in numbers within the Secretary's discretion, a maximum of 400,000 sharptail grouse, 1500 antelope, and that number of secondary species reasonably necessary to maintain a balanced wildlife population. Beyond those limits, wildlife and livestock have equal priority in access to the forage resources of the Range.
 
 
 16
 We do not believe the Secretary would vigorously dispute our reading of E.O. 7509. Fundamentally, our reading is that of the Secretary tempered by the numerical limits on priority for wildlife set out explicitly in the order. The Secretary does, however, argue that E.O. 7509, regardless of how it is read, is irrelevant to the priority scheme that must currently be employed on the Range because legislation passed by Congress in 1976 revoked E.O. 7509 and set forth a new priority scheme for access to the forage resources of the Range. It is to that argument that we now turn.
 
 III
 
 17
 On October 15, 1966, Congress enacted the National Wildlife Refuge System Administration Act, Pub.L. 89-669, 80 Stat. 927 (codified as amended at 16 U.S.C. Secs. 668dd-668ee (1976)), establishing the National Wildlife Refuge System. Then, in 1976 Congress enacted the Wildlife Refuge Act Amendments, Pub.L. 94-223, 90 Stat. 199 (codified at 16 U.S.C. Sec. 668dd (1976)). That legislation provided that
 
 
 18
 [f]or the purpose of consolidating the authorities relating to the various categories of areas that are administered by the Secretary of the Interior for the conservation of fish and wildlife, ... all lands, waters, and interests therein administered by the Secretary as wildlife refuges, ... wildlife ranges, game ranges, wildlife management areas, or waterfowl production areas are hereby designated as the 'National Wildlife Refuge System' (referred to herein as the 'System'), which shall be ... administered by the Secretary through the United States Fish and Wildlife Service.
 
 
 19
 The legislation thus transferred control of the Russell Range from the Bureau of Land Management and the Fish and Wildlife Service jointly to the Fish and Wildlife Service alone. The Secretary argues that P.L. 94-223 was passed to assure that wildlife would have absolute priority in access to the forage resources of the Range and that the priority scheme it mandated superseded any scheme that may have been effected by E.O. 7509. Pursuant to this interpretation of the 1976 Amendments, on May 3, 1978 the Secretary issued Public Land Order 5635, 43 Fed.Reg. 19046 (1978), which transferred control of the Russell Range to the Fish and Wildlife Service, decreed that the Range was to be administered under the Wildlife Refuge Act, and declared that E.O. 7509 had been modified to the extent necessary to conform to these two orders.
 
 
 20
 The district court declared P.L.O. 5635 invalid. It held that the 1976 Amendments neither revoked the priority scheme set out in E.O. 7509 nor changed the statute under which the Range was to be administered. The district court held further that the only effect P.L. 94-223 had in regard to the Russell Range was to transfer administrative responsibility for the Range to the Fish and Wildlife Service. On appeal, the Secretary argues that we should reverse the district court and hold P.L.O. 5635 a valid exercise of his power.
 
 
 21
 The district court based its holding on the fact that the language of P.L. 94-223 did not explicitly revoke E.O. 7509 with respect to access to the forage resources of the Range. It refused to consider the legislative history of P.L. 94-223, relying on the "plain meaning" doctrine of statutory construction. The court reasoned that because P.L. 94-223 was not "ambiguous"--because its meaning was plain--there was no need to resort to legislative history. This, we believe, was error.
 
 
 22
 First, the district court misapplied the plain meaning rule. As stated by the Supreme Court less than two years ago, "the plain-meaning rule is 'rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists.' " Watt v. Alaska, 451 U.S. 259, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981) (quoting Boston Sand Co. v. United States, 278 U.S. 41, 48, 49 S.Ct. 52, 54, 73 L.Ed. 170 (1928)). "[E]ven the most basic general principles of statutory construction," the Court stated, "must yield to clear contrary evidence of legislative intent." National Railroad Passenger Corp. v. National Association of Railroad Passengers, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974).
 
 
 23
 Second, the meaning of P.L. 94-223 is not altogether clear. It is true that the language of the statute only transfers control of the Range to the Fish and Wildlife Service and does not mention the relative priorities of livestock and wildlife in access to the forage resources of the Range. However, the primary mission of the Fish and Wildlife Service is wildlife preservation. Fish and Wildlife Act of 1956, Sec. 2, 16 U.S.C. Sec. 742a (1976). It is certainly possible to argue that when Congress transferred administrative responsibility for the Range to the Fish and Wildlife Service it had in mind the primary mission of the agency and intended to change the relative priority between livestock and wildlife on the Range. In short, P.L. 94-223 is sufficiently ambiguous to justify resort to its legislative history.
 
 
 24
 When we consider the legislative history of P.L. 94-223, it is clear that both legislators and members of the Department of the Interior instrumental in the passage of P.L. 94-223 believed that wildlife either already had or would, after passage of the 1976 Amendments, have priority on the Range. The Assistant Secretary of the Interior noted during the hearings on the Amendments that "[the] BLM will continue to manage the areas for the dominant use of wildlife." Letter from John Kyl, Assistant Secretary of the Interior, to Senator Warren G. Magnuson, Chairman, Senate Committee on Commerce (May 20, 1975), reprinted in 1976 U.S.Code Cong. & Ad.News 288, 296. One Congressman stated that the ranges under discussion "have been set aside primarily to protect the resident wildlife and their habitat .... All acknowledge that the law requires that fish and wildlife be first priority on these three ranges." 121 Cong.Rec. 36,597 (1975). The Senate Floor Manager of the bill explained that
 
 
 25
 [t]he Executive Order which created the game ranges specified that grazing would be permitted only when compatible with wildlife needs.
 
 
 26
 * * *
 
 
 27
 * * *
 
 
 28
 [The Fish and Wildlife Service intention is] to permit continuation of grazing on the game ranges where it does not interfere with the wildlife for which the areas were created.
 
 
 29
 * * *
 
 
 30
 * * *
 
 
 31
 What the bill does, simply is to say to the Fish and Wildlife Service "You administer this for the preservation of the wildlife and to the extent that it is compatible therewith, continue to issue grazing permits or whatever reasonable use there is of public lands."
 
 
 32
 * * *
 
 
 33
 * * *
 
 
 34
 [I]t is the legislative intent, so far as this bill is concerned, that the Fish and Wildlife Service will continue to manage these ranges to be utilized to whatever extent possible for other uses besides preservation of the fish and wildlife, so long as it does not impinge upon it and make it impossible to preserve those values.
 
 
 35
 122 Cong.Rec. 2294-2295 (1976).
 
 
 36
 Were we to consider only the statute, read in light of its legislative history, we would rule that P.L. 94-223 commands that wildlife have priority in access to the forage resources of the Range and that the Range is to be administered under the Wildlife Refuge Act. We cannot consider the statute alone, however, for in determining its effect we must not only determine the meaning of P.L. 94-223 but must also determine whether the statute effectively revoked the contrary commands of E.O. 7509.
 
 
 37
 It is the law of our circuit that revocation or modification of an existing withdrawal should be express to be effective. See United States v. Consolidated Mines and Smelting Co., Ltd., 455 F.2d 432, 445-46 (9th Cir.1971). Repeal of a statute or order by implication is not favored. Watt v. Alaska, 451 U.S. 259, 267, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981). We believe, given this rule, the priority scheme established by E.O. 7509 has not been revoked. Nowhere in the 1976 Amendments is anything said about priority in access to the forage resources of the Range. There is simply no mention of livestock, grazing, or E.O. 7509. Furthermore, the legislative history on this point is more indicative of confusion regarding the existing priority scheme than of an intent to change priorities. Many legislators seemed to think E.O. 7509 had established an absolute wildlife priority. Such confusion is not sufficient to revoke E.O. 7509. We thus hold that P.L. 94-223 did not revoke the priority scheme for access to the resources of the Range established by E.O. 7509.
 
 IV
 
 38
 The Secretary contends also that P.L. 94-223 mandates that any grazing activity on the Russell Range be administered under the Wildlife Refuge Act rather than the Taylor Grazing Act, under which the Range was previously administered. The district court, however, held that P.L. 94-223 did not change the statute under which the Range is to be administered. We agree with the Secretary.
 
 
 39
 While the language of P.L. 94-223 does not explicitly change administration of the Range from the Taylor Grazing Act to the Wildlife Refuge Act, when the statute is read in conjunction with its legislative history the intention to change Range management to the Wildlife Refuge Act is clear. The Wildlife Refuge Act is the statute under which the Fish and Wildlife Service manages the National Wildlife Refuge System. It defies reason to suggest that Congress merely liked the personnel of the Fish and Wildlife Service more than those of the Bureau of Land Management. Congress clearly wanted the Russell Range administered by the Fish and Wildlife Service because of its underlying mission to protect wildlife. The Wildlife Refuge Act is an integral part of that mission and, we believe, was part of the change Congress intended in transferring administrative responsibility for the Russell Range from the Bureau of Land Management to the Fish and Wildlife Service.
 
 
 40
 Moreover, the legislative history of the 1976 Amendments indicates that at least some leading legislators believed that transfer of management from the Bureau of Land Management to the Fish and Wildlife Service changed the statute under which the Range was to be administered from the Taylor Grazing Act to the Wildlife Refuge Act. Senator Moss noted:
 
 
 41
 On behalf of the Committee on Commerce I would like to assure the Senator from Montana that sole administration of the Kofa, Russell, and Sheldon Game Ranges by the Fish and Wildlife Service will not result in the instantaneous termination of existing grazing privileges on these areas. Rather, it is the committee's understanding that the Service will continue to honor valid existing grazing permits that were issued by BLM under the Taylor Grazing Act. When these permits expire, the Service will then reexamine them to determine if continued grazing is compatible with wildlife needs. Grazing will be permitted to the extent compatible and will be administered by the Service pursuant to the National Wildlife Refuge Administration Act. I might note that the Service is currently administering over 1 million acres of refuge lands in 31 States for grazing purposes.
 
 
 42
 122 Cong.Rec. 2294 (1976).
 
 
 43
 We thus hold that, while P.L. 94-223 did not change the relative priorities of wildlife and livestock on the Charles M. Russell National Wildlife Range, it did change the statute under which the Range is to be administered from the Taylor Grazing Act to the National Wildlife Refuge System Administration Act.
 
 V
 
 44
 The judgment of the district court is VACATED to the extent that it is inconsistent with this opinion. The cause is remanded for entry of declaratory judgment that (1) wildlife has priority in access to the forage resources of the Range up to the limits specified in E.O. 7509; (2) beyond those limits, wildlife and livestock have equal priority in access to the resources of the Range; and (3) the Range is to be administered under the Wildlife Refuge Act.
 
 
 45
 REMANDED.
 
 
 
 [1]
 After the district court granted plaintiff's motion for partial summary judgment, both the plaintiffs and the Secretary filed notices of appeal invoking the jurisdiction of this court pursuant to 28 U.S.C. Sec. 1292(a)(1) (1976). The plaintiffs then filed a motion to dismiss the appeals, arguing that there was no jurisdiction under section 1292(a)(1). We denied the motion to dismiss, holding that we had jurisdiction to hear the appeals under section 1292
 
 
 [2]
 These grazing districts were established on lands withdrawn from settlement and sale by Executive Order No. 6910 (Nov. 26, 1934). That order, signed in 1934, withdrew all unappropriated public land in several Western States from settlement and sale pending determination of "the most useful purpose to which such land may be put in consideration of the provisions of the [Grazing] Act ... and for conservation and development of natural resources." The district court held that the order withdrew the Russell Range for grazing purposes under the Taylor Grazing Act. Because it could find no evidence that this withdrawal has been revoked, the district court held that grazing and wildlife had equal priority on the Range and the Russell Range must still be administered under the Taylor Grazing Act. The Secretary argues, and the ranchers seem to concede, Brief for Plaintiff-Appellees at 14 n. 3, that the district court erred on this point. The district court decision ignores Executive Order No. 7274 (Jan. 14, 1936), signed by President Roosevelt in 1936. That order amended E.O. 6910 to exclude "from the operation thereof all lands which are now, or may hereafter be, included within grazing districts duly established pursuant to the provisions of the TGA so long as such lands remain a part of any such grazing district." This order, both parties agree, revoked E.O. 6910 as to the Russell Range. Thus any withdrawal of the Russell Range lands effected by E.O. 6910 was no longer valid. The dispute in this case thus centers not on the meaning of E.O. 6910, but instead on the meaning of E.O. 7509, which followed it
 
 
 [3]
 In 1936, when E.O. 7509 was issued, the Bureau of Land Management was a part of the Department of the Interior while the Fish and Wildlife Service was a part of the Department of Agriculture. It was not until three years later, in 1939, that Fish and Wildlife Service was moved to the Department of the Interior and the Secretary of the Interior thereby became responsible for administration of the entire Range
 
 
 [4]
 The ranchers argue that this historical practice should be dispositive in our interpretation of E.O. 7509. While lengthy historical practice can be a significant aid in interpreting unclear legislative or executive pronouncements, see Bryant v. Yellen, 447 U.S. 352, 100 S.Ct. 2232, 65 L.Ed.2d 184 (1980); Andrus v. Shell Oil Co., 446 U.S. 657, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980), it is useful only in interpreting language that is facially unclear. In the case of E.O. 7509, we cannot ignore the order's explicit language establishing a limited priority for wildlife on the Russell Range, even if the Bureau of Land Management and the Fish and Wildlife Service chose to do so for a number of years