**GENERAL MOTORS CORPORATION,
Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 00–40C.**

United States Court of Federal Claims.

Sept. 14, 2007.*

Marcia G. Madsen, Washington, DC, for plaintiff. Andrew J. Morris, Cameron S. Hamrick, and Robert L. Bronston, of counsel. Daniel F. Doogan, Detroit, MI, of counsel.

C. Coleman Bird, Washington, DC, with whom were Assistant Attorney General Peter D. Keisler, and Director David M. Cohen, for defendant. Stephen R. Dooley, Defense Contract Management Agency, of counsel.

## OPINION

FIRESTONE, Judge.

Pending before the court are the parties' cross-motions for partial summary judgment related to the actuarial assumptions to be used to calculate a segment-closing adjustment to pension costs under Cost Accounting Standard 413 ("CAS 413" or "original CAS 413"), 48 C.F.R. § 9904.413–50(c)(12) (1993).[1] This is the third in a series of decisions in this case regarding the proper interpretation of CAS 413.50(c)(12).[2] This provision provides, in relevant part, as follows: "If a segment is closed, the contractor shall determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated." *Id.* At issue here is what actuarial assumptions—specifically, assumptions related to the interest rate the pension assets will earn in the future and the plan participants' mortality rate—should be used to calculate the "actuarial liability" for the closed segment.

---

* Opinion Originally Filed Under Seal on September 10, 2007.

1. While CAS 413 was revised in 1995, all of the contracts at issue in this case predate these changes, and, as such, are governed by original CAS 413, which was promulgated in 1977 and became effective in 1978 (42 Fed.Reg. 37196). Therefore, the court's decision with regard to the pending motions in this case is limited to original CAS 413. References to CAS 413 are to original CAS 413 unless otherwise stated.

2. The court's prior decisions in the case include *General Motors Corp. v. United States*, 66 Fed.Cl. 153 (2005), and the court's August 9, 2001 Order, which incorporated the court's opinion in *Teledyne, Inc. v. United States*, 50 Fed.Cl. 155 (2001), *aff'd*, 316 F.3d 1366 (Fed.Cir.2003), *pet. for cert. denied*, 540 U.S. 1068, 124 S.Ct. 804, 157 L.Ed.2d 732 (2003).

The closed segment[3] in this case is the Allison Gas Turbine Division ("Allison") through which the plaintiff, General Motors Corporation ("plaintiff" or "GM"), provided services to the government. GM's sale of the Allison segment in 1993 constituted a "segment closing" which triggered certain obligations under CAS 413.50(c)(12) related to the pension costs for Allison's defined benefit pension plans.[4] CAS 413 provides for adjustments to a contractor's pension costs to account for a closed segment's surplus or deficit. *See Teledyne v. U.S.*, 316 F.3d 1366, 1381 (Fed.Cir.2003) ("[T]he purpose of the segment closing adjustment is to identify where the government may have over or under contributed to pension costs under prior contracts.") (quoting *Teledyne,* 50 Fed.Cl. at 180); *General Electric v. United States,* 60 Fed.Cl. 782, 785 (2004) (stating that CAS 413 provides for "an eventual settling-up of pension costs between contractors and the government when a segment belonging to the contractor ceases to engage in government contracting."). Under this provision, the government may be liable for its share of a pension deficit or the government may be able to recoup its share of a pension surplus.

The parties do not dispute that Allison's pension plan had a deficit at the time of its sale. However, the parties disagree on the amount of the deficit—and therefore the amount of the government's share of the deficit—based on the differing actuarial assumptions that they contend are required by CAS 413 to be used to calculate the "actuari-

al liability" of the pension plan. The difference between the actuarial assumptions advocated by the government and GM for the segment-closing adjustment result in a difference of millions of dollars in the government's share of the closed segment's pension deficit.

GM argues that CAS 413 requires the use of the Pension Benefit Guarantee Corporation ("PBGC")[5] actuarial assumptions. The PBGC actuarial assumptions are as follows: interest rates of 5.6% for the first 25 years and 5.25% for later years and mortality assumptions based on the 1983 Group Annuity Mortality Table. Def.'s Proposed Findings of Uncontroverted Fact No. 6.

The United States ("government") argues that CAS 413 requires the use of the actuarial assumptions GM developed under CAS 412.40(b)(2), 48 C.F.R. § 9904.412–40(b)(2) (1993), ("CAS 412" or "original CAS 412"),[6] which governs the accounting of pension costs on an annual basis. GM's CAS 412.40(b)(2) assumptions in 1993[7] were as follows: an interest rate of 9.0% and mortality assumptions based on the UP–84 Mortality Table (with various setbacks). Pl.'s Resp. to Def.'s Proposed Findings of Uncontroverted Fact No. 2.

The parties do not dispute that PBGC actuarial assumptions apply to a segment-closing adjustment under CAS 413 where a pension plan has terminated. The parties also do not dispute that the Allison segment's

---

**3.** CAS 413 defines a "segment" as "one of two or more divisions, product departments, plants, or other subdivisions of an organization reporting directly to a home office." CAS 413.30(a)(11).

**4.** As the Federal Circuit explained in *Teledyne,* 316 F.3d at 1370, regarding defined benefit pension plans:

A contractor sponsoring a defined benefit pension plan generally guarantees the payment of the future benefits under the plan and therefore deposits amounts anticipated to be sufficient to pay the benefits to participants for their entire life. These deposits are part of the cost of doing business with the contractor and they are therefore paid, in part, by the contractee, in [this] case[ ], the government.

**5.** The PBGC is a federal corporation that guarantees pension plans. 29 U.S.C. § 1302 (2000).

**6.** While CAS 412 was revised in 1995, as discussed above, all of the contracts at issue in this case predate these changes. Therefore, unless otherwise stated, references to CAS 412 are to original CAS 412, which was promulgated in 1975 (40 Fed.Reg. 43876). CAS 412.40(b)(2) provides, in relevant part, as follows:

Each actuarial assumption used to measure pension cost shall be separately identified and shall represent the contractor's best estimates of anticipated experience under the plan, taking into account past experience and reasonable expectations. The validity of the assumptions used may be evaluated on an aggregate, rather than on an assumption-by-assumption, basis.

**7.** The parties do not dispute that GM's actuarial assumptions under CAS 412 complied with the requirements of CAS 412.40(b)(2).

pension plans were not terminated and that the segment's pension assets have not been distributed to the plan participants.[8] Therefore, the issue presented to the court is what actuarial assumptions must be used to calculate actuarial liability in a CAS 413 segment-closing adjustment where the pension plan has not been terminated.

For the reasons that follow, the court **GRANTS** the government's motion for partial summary judgment and **DENIES** GM's motion for partial summary judgment.

## BACKGROUND

### A. Background Facts

The background facts are set forth in the court's 2005 opinion. *General Motors Corp.*, 66 Fed.Cl. at 154–155. The court does not repeat all of these facts here. The relevant facts for the purposes of the parties' cross-motions are undisputed and are set forth as follows. On December 1, 1993, GM sold its Allison division. The sale of Allison constituted a segment closing under CAS 413. Prior to the segment closing, GM sponsored two defined benefit plans, one for its hourly employees and one for its salaried employees. As noted, GM did not terminate either plan and retained all of the liabilities and assets associated with the segment. At the time of the Allison segment closing, GM's pension funds were underfunded, including the portion allocated to the Allison segment.

### B. The Parties' Experts

In support of their motions, GM offered the affidavits and testimony from Victor Modugno, Ellen A. Hennessy, and Dennis E. Logue, and the government offered the affidavits and testimony from Colin England. The affidavits and testimony were offered to explain the actuarial science and policy surrounding pension issues in order for the court to better understand the technical use of actuarial assumptions in different contexts. The testimony was not offered as opinion evidence as to the specific meaning of the CAS 413 regulation.[9] There were no objections to the qualifications of any of the experts offered. The testimony of the parties' experts can be summarized as follows:

GM's first expert, Mr. Modugno,[10] stated that pension actuaries use different assumptions depending upon whether they are valuing an ongoing pension plan or whether they are settling pension liabilities. Modugno Decl. ¶ 14. Mr. Modugno stated that in the ongoing pension plan context, the existence of future periods permits the use of valuations that are based on long-term assumptions because the plan can make adjustments over future years, whereas, in the settlement context, future adjustments are not possible and the purpose of the valuation is to reflect current reality. *Id.* ¶ 15. Mr. Modugno stated that a segment closing is akin to a settlement in actuarial terms because from the government's perspective there are no future periods for sharing the risk of fully funding the pension plan. *Id.* In the settle-

---

**8.** The Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* (2000) ("ERISA"), requires a company voluntarily terminating its single-employer pension plan to distribute assets to the plan participants. *See* 29 U.S.C. § 1341(b)(3)(A). This requirement was also in effect in 1993. Employers usually do this by purchasing an annuity or giving their employees a lump-sum payment. *See Beck v. Pace Int'l Union,* —— U.S. ——, 127 S.Ct. 2310, 2318, 168 L.Ed.2d 1 (2007) ("[L]ongstanding ERISA practice . . . ha[s] employed almost exclusively annuities and lump-sum payments.").

**9.** The court accepted expert affidavits and testimony for the sole purpose of understanding how various actuarial terms found in CAS 413 are used in practice. Due to the complexity of these actuarial terms, the court found it beneficial to hold a hearing of experts to better understand

these terms before interpreting the CAS 413 provision at issue in this case. Importantly, the court does not rely on the expert testimony in interpreting the language of CAS 413. As the Federal Circuit stated in *Rumsfeld v. United Technologies Corp.,* 315 F.3d 1361, 1369 (Fed. Cir.2003), expert testimony is irrelevant to the court's interpretation of the CAS, which is a question of law.

**10.** Mr. Modugno is a Fellow of the Society of Actuaries, a Fellow of the Conference of Consulting Actuaries, and a Member of the American Academy of Actuaries. He has 35 years of actuarial work experience, much of which was in pricing single premium group annuities for terminating pension plans and for settlements at several large insurance companies. Declaration of Victor Modugno, filed Nov. 22, 2006 ("Modugno Decl.") ¶ 1.

ment context, Mr. Modugno stated that the actuarially appropriate discount rate for determining the "present value of future benefits" is the market rate for an annuity that covers the plan's liabilities. *Id.* ¶ 40. Mr. Modugno stated that the use of a market rate in a settlement context is a well-established practice, as confirmed by other authorities, including Actuarial Standard of Practice ("ASOP") 27 [11] and Financial Accounting Standards ("FAS") 87.[12] *Id.* ¶ 41, 42. On cross-examination, Mr. Modugno conceded that ASOP 27 and FAS 87 were issued well after the promulgation of CAS 413, in December 1996 and December 1985, respectively. Tr. 111, 86. Mr. Modugno conceded that ASOP 27 does not require termination assumptions to be used in the context where there is no possibility of future correction. Tr. 111–112. Mr. Modugno conceded that under the predecessor guidance to FAS 87, known as Accounting Principles Board ("APB") 8, which was in effect at the time of the promulgation of CAS 413, actuarial valuation was based on a single interest rate that represented the expected average return on plan assets. Tr. 87–94. Mr. Modugno stated that FAS 87 was created to address problems in financial accounting that arose in the 1980s under the prior regulatory regime. Tr. 90.

With regard to the market rate, Mr. Modugno identified a study performed in 2000 by the American Academy of Actuaries which concluded that the PBGC's calculation of pension plan liabilities was very close to the cost that insurers charged to purchase annuities to close out these plans and therefore provided a legitimate estimate of what it would cost to settle pension liabilities. Modugno Decl. ¶ 47. Mr. Modugno also stated that where the *assets* are calculated at market value (rather than at actuarial value), it is unreasonable, in actuarial terms, not to also calculate the *liability* at market rates. *Id.* ¶ 48.

Finally, Mr. Modugno stated that using a discount rate based upon historic equity returns would be actuarially inappropriate in a settlement context. *Id.* ¶¶ 50–55. According to Mr. Modugno, GM's liability for Allison's pension plans is the same regardless of how the assets are invested. *Id.* ¶ 50. Mr. Modugno stated that historic returns are not necessarily predictive of future performance. *Id.* ¶ 54. Therefore, Mr. Modugno concluded, assumptions that may have been reasonable where they could be adjusted and where gains and losses could be amortized, are no longer reasonable if they are significantly different from current market rates and if no future adjustment is possible. *Id.* ¶ 55.

GM's second expert, Ms. Hennessy,[13] stated that PBGC actuarial assumptions are de-

---

11. Mr. Modugno relied on the following provision of ASOP 27 regarding the factors relevant to choosing a discount rate for pension liabilities: "Purpose of the Measurement—The purpose of the measurement is a primary factor. For example, an actuary measuring a plan's termination liability may use an investment return rate reflecting interest rates implicit in current or anticipated future annuity purchase rates." ASOP 27, § 3.63.

12. Mr. Modugno relied on the following provision of FAS 87 regarding the valuation of liabilities at a market rate:

Assumed discount rates shall reflect the rates at which the pension benefits would be effectively settled. It is appropriate in estimating those rates to look to available information about rates implicit in current prices of annuity contracts that could be used to effect settlement of the obligation (including information about available annuity rates currently published by the Pension Benefit Guaranty Corporation).

FAS 87 ¶ 44.

Mr. Modugno also relied on the following provision of FAS 87 regarding the distinction between the discount rate for liabilities and the plan's return on assets:

The Board concluded that selection of the discount rates should be based on current prices for settling the pension obligation. Under the Statement, the discount rates are used most significantly to calculate the present value of the obligation and the service cost component of net periodic pension cost. Both of these uses are conceptually independent of the plan's assets. If two employers have made the same benefit promise, the Board believes the service cost component and the present value of the obligation should be the same even if one expected to earn an annual return of 15 percent on its plan assets and the other had an unfunded plan.

FAS 87 ¶ 198.

13. Ms. Hennessy has been working in the employee benefits field since 1978 in both private practice and the government. Her experience includes working for five years at the PBGC as

signed to approximate the costs of purchasing commercial annuities of the type used to close out a defined benefit plan. Hennessy Decl. ¶¶ 8–11. Ms. Hennessy stated that PBGC's actuarial assumptions are used for a variety of purposes, including: the allocation of assets on termination of underfunded plans; the determination of actual and potential employer liability for underfunded plans; the division of defined benefit assets and liabilities in plan transfers and spinoffs, usually in connection with corporate transactions; and the determination of whether additional vesting should occur on a partial termination. *Id.* ¶ 8.

GM's third expert, Dr. Logue,[14] stated that the value of a pension liability is independent of the expected return on the corresponding asset. Logue Decl. ¶ 17. Dr. Logue provided an example of a homeowner who takes out a 30–year mortgage for $100,000 at a 6 percent rate of interest. The homeowner intends to invest the proceeds in a portfolio of stocks with an expected return of 15%. Discounting the mortgage obligation at 15% yields a present value of $52,000. Dr. Logue asserted that the homeowner's net worth does not automatically rise by $48,000, and that the liability of the homeowner does not change with the asset purchased with the loan proceeds, no matter what happens to the asset purchased. *Id.* ¶ 18. Likewise, Dr. Logue stated that if GM chooses to invest in a risk portfolio in an attempt to reduce possible future pension costs, this does not affect the fact that the government's share of the

pension obligation should be discounted at a low risk rate. *Id.* ¶ 19. Dr. Logue further stated that it would not make sense to treat two contractors differently solely because the firms had different investment return expectations. *Id.* ¶ 20. Dr. Logue concluded that a low-risk, market-based discount rate, such as the PBGC rate, is appropriate to determine the present value of a pension liability because pension plan obligations are fixed and should not change with market conditions. *Id.* ¶¶ 24–25.

The government's expert, Mr. England,[15] stated that a plan's unfunded actuarial liability is equal to the amounts remaining to be amortized in future years. Supplemental Declaration of Colin England, filed January 31, 2007 ("England Supp. Decl.") ¶ 10. Mr. England stated that in a segment-closing adjustment, the unfunded actuarial liability represents the amounts of pension costs that should have been recognized and charged in the past, but were not recognized and charged, and that would have been recognized and charged to contracts in the future if the contracting relationship had continued and the segment had not been closed. *Id.* Mr. England stated that a segment-closing adjustment is not forward looking, but rather looks backwards towards the correction of past differences between projected and actual experience. *Id.* ¶ 12.

Mr. England stated that this was consistent with the actuarial principle embodied in ERISA's "equation of balance." 26 C.F.R. § 1.412(c)(3)–1(b)(1) (2007).[16] According to

Deputy Executive Director and Chief Negotiator, where she headed what was called the PBGC Early Warning Program. She is an adjunct professor in the L.L.M. program at Georgetown University Law Center, where she teaches courses on employee benefits. Declaration of Ellen A. Hennessy, filed Nov. 22, 2006 ("Hennessy Decl.") ¶ 3–7.

14. Dr. Logue is a financial economist. He is currently Board Chair of Ledyard National Bank. Previously he was Dean and Fred E. Brown Chair at the Michael F. Price College of Business at the University of Oklahoma, and prior to that he was the Steven Roth Professor of Management at the Tuck School at Dartmouth College. He is the past president of the Financial Management Association and is a fellow of that organization. He is also a member of the Financial Economists Roundtable. Declaration of Dennis

E. Logue, Ph.D., filed Nov. 22, 2006 ("Logue Decl.") ¶ 4.

15. Mr. England is a Fellow of the Society of Actuaries, an Enrolled Actuary, and a Certified Employee Benefit Specialist. He is the manager of the Actuarial and Benefits Consulting operations of Wachovia Retirement Services. He has 25 years of consulting experience, primarily with retirement plans. For the last 11 years, he has taught classes at the PBGC for new actuaries regarding their duties, and the applicable rules and regulations relating to terminating pension plans. Declaration of Colin England, filed Nov. 22, 2006 ("England Decl.") ¶ 7.

16. ERISA's "equation of balance" provides as follows:

(b) *General rules for reasonable funding methods—*

Mr. England, the "equation of balance" would be modified in the CAS 413.50(c)(12) context to look at the market value of assets (rather than at the actuarial value of assets as is done under ERISA). Tr. 426. Mr. England stated that the "equation of balance" under CAS 413.50(c)(12) requires that, at any point in time, the sum of a segment's outstanding amortization bases is exactly mathematically equal to the segment's unfunded actuarial liability (determined using the market value of plan assets) minus any prepayment credits (past pension contributions in excess of maximum allowable pension costs under CAS 412). Tr. 427. Mr. England stated that the mathematical equivalence derived under the "equation of balance" only works if the actuarial assumptions remain constant. Tr. 428. On cross-examination, Mr. England conceded that the regulation codifying the "equation of balance" under ERISA is limited to ongoing plans. Tr. 556–557. Mr. England conceded that the "equation of balance" would not work where a segment's plan was over funded. Tr. 600. Mr. England also conceded that the "equation of balance" is not mentioned in CAS 413 and that the Internal Revenue Service first put it into regulations in 1980. Tr. 560–561. However, Mr. England stated that the actuarial principle of the "equation of balance" is so well established that it is "almost part of the DNA of an actuary." Tr. 406–407.

In addition, Mr. England stated that there is no simple division between "ongoing" and "settlement" plan valuations, and that actuaries ordinarily use plan termination assumptions only when the pension plan is, in fact, terminating. England Supp. Decl. ¶ 18. Mr. England stated that plan termination assumptions are only used when the plan is no longer "ongoing" and there is a settlement of the plan's liability to plan participants by

means of an annuity purchase or lump sum payments. *Id.* ¶ 24.

Mr. England countered Mr. Logue's mortgage example by stating that, while the proceeds from a portfolio that is expected to earn 15% will not reduce the fixed amount of the monthly payments for a 6% mortgage, the homeowner could reduce his portfolio to the amount that will match the monthly mortgage payments and pocket the difference. *Id.* ¶ 39–40.

## C.  Positions of the Parties

Based on the information provided by its experts, GM contends that CAS 413 requires the use of PBGC actuarial assumptions to calculate the Allison segment-closing adjustment because the contractual relationship between the government and the contractor's closed segment ends, and therefore the segment closing is analogous to a plan termination. GM argues that the use of PBGC actuarial assumptions is required because this final settlement relieves the government of all future risks associated with the closed segment's pension obligations. GM contends that the most accurate measure of a segment's actuarial liability is the market for insurance company annuities that settle pension obligations, and that the PBGC's actuarial assumptions best reflect this market. GM contends that the actuarial assumptions developed under CAS 412 are inappropriate in a segment-closing adjustment because they are limited to long-term situations contemplating future periods.

The government contends that CAS 413 requires the use of the contractor's actuarial assumptions under CAS 412 because the purpose of a segment-closing adjustment is to deal with the end of the amortization process that had been required to correct past over- and under-estimates of pension cost that had

(1) *Basic funding formula.* At any time, except as provided by the Commissioner, the present value of future benefits under a reasonable funding method must equal the sum of the following amounts:
  (i) The present value of normal costs (taking into account future mandatory employee contributions, within the meaning of section 411(c)(2)(C), in the case of a contributory plan) over the future working lifetime of participants;

(ii) The sum of the unamortized portions of amortizable bases, if any, treating credit bases under section 412(b)(3)(B) as negative numbers; and
(iii) The plan assets, decreased by a credit balance (and increased by a debit balance) in the funding standard account under section 412(b).

been previously charged to the government under CAS 412. The government contends that a segment-closing adjustment under CAS 413 equals the amount of the segment's unfinished amortizations. The government further argues that GM's theory based on the government sharing the "risk" of pension funding is unfounded, because the government never had any obligation or had any "risk" to fund the GM pension plan. Instead, the government argues that it simply reimbursed GM for GM's pension costs, based on GM's best estimates. The government argues that, because it had no obligation to fund the pension plan, there was no "termination" here. Rather, according to the government, termination assumptions are appropriate only where the pension plan is actually terminated and plan participants are given a guaranteed annuity or lump sum settlement.

## D. Proceedings Below

Initial briefs on the parties' cross-motions for partial summary judgment were filed on November 17, 2006 and January 31, 2007. On February 26–28, 2007, the parties presented testimony from their expert witnesses regarding the actuarial policies associated with making interest rate and mortality rate assumptions for pension plans. The parties filed supplemental briefs on May 11, 2007. Oral argument on the parties' motions was held on July 23, 2007.

## DISCUSSION

### A. Standard of Review

It is well-settled that this court is required to enter summary judgment for a party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RCFC 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Unidynamics Corp. v. Automatic Prod. Int'l.*, 157 F.3d 1311, 1316 (Fed.Cir. 1998). Here, the primary issues concern the proper interpretation of original CAS 413.50(c)(12), which is a question of law. *See United Technologies Corp.*, 315 F.3d at 1369

("[T]he interpretation of CAS [ ] is an issue of law, not an issue of fact, as we have made clear in our prior decisions."); *Billings v. United States*, 322 F.3d 1328, 1332 (Fed.Cir. 2003) ("The underlying issue, one of statutory and regulatory construction, is a question of law...."); *Perry v. Martin Marietta Corp.*, 47 F.3d 1134, 1137 (Fed.Cir.1995) (In the context of interpreting FAR provisions that were intended to implement the CAS, stating: "The interpretation of regulations incorporated into a contract is purely a legal question.") (citations omitted). Where, as here, the issue presented is a pure question of law, summary judgment is particularly appropriate. *See, e.g., Dana Corp. v. United States*, 174 F.3d 1344, 1347 (Fed.Cir.1999).

### B. CAS 413 Requires The Use of the Actuarial Assumptions Developed Under CAS 412 to Calculate the "Actuarial Liability" Where There is No Plan Termination.

#### 1. Rules for Interpreting CAS 413

The primary dispute between the parties concerns the meaning of "actuarial liability," as this phrase is used in CAS 413.50(c)(12). Tasked with the interpretation of CAS 413, the court begins with the language of the CAS 413 regulation, as is required for regulatory and statutory interpretation. *See Banks v. United States*, 69 Fed.Cl. 206, 216 (2006) ("In interpreting the limitation [in the regulation], the court first looks to the plain language of the limitation, as the canons of statutory and regulatory interpretation require."); *Henry Ford Health Sys. v. Shalala*, 233 F.3d 907, 910 (6th Cir.2000) ("We read statutes and regulations with an eye to their straightforward and commonsense meanings."). Where the language of the regulation or statute provides a clear answer, the analysis ends there. *See Snyder v. Nicholson*, 489 F.3d 1213, 1217 (Fed.Cir.2007) ("Our analysis begins with 'the language of the statute.' And where the statutory language provides a clear answer, it ends there as well.") (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999)) (internal quotation omitted).

The court's analysis includes both the text of the CAS 413 regulation as well as its regulatory history. *See Bull v. United States,* 479 F.3d 1365, 1376 (Fed.Cir.2007) ("Beyond the statute's text, [the 'traditional tools of statutory construction'] include the statute's structure, canons of statutory construction, and legislative history.") (quotations omitted). In this connection the court will also examine the Preamble to CAS 413 to gain a better understanding of the CAS 413 regulations. *See Ass'n of Am. R.R. v. Surface Transp. Bd.,* 237 F.3d 676, 681 (D.C.Cir.2001) ("[A]lthough the language in the preamble of a statute is 'not an operative part of the statute,' it may aid in achieving a 'general understanding' of the statute.") (quotations omitted).

For the reasons explained below, the court agrees with the government and concludes that the plain language of CAS 413.50(c)(12), the related definitions in CAS 413, the Preamble to CAS 413, as well as a review of revised CAS 413, require that the contractor use the actuarial assumptions (i.e., the interest rate and mortality assumptions) developed under CAS 412.40(b)(2) to calculate the actuarial liability of a segment's pension plan when the pension plan has not been terminated.

### a. CAS 413 Defines "Actuarial Liability" Based on the CAS 412 "Cost Method in Use."

The first sentence of CAS 413.50(c)(12) provides as follows: *"If a segment is closed, the contractor shall determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated."* (emphasis added). "Actuarial liability" is defined as follows:

Actuarial liability means pension cost attributable, *under the actuarial cost method in use,* to years prior to the date of a particular actuarial valuation. As of such date, the actuarial liability represents the excess of the present value of the future benefits and administrative expenses over the present value of future contributions for the normal cost for all plan participants and beneficiaries. The excess of the actuarial liability over the value of the assets of a pension plan is the unfunded actuarial liability.

CAS 413.30(a)(4) (emphasis added). An "actuarial cost method" is defined in CAS 413 as "a technique which uses *actuarial assumptions* to measure the present value of future benefits ..." CAS 413.30(a)(2) (emphasis added). An "actuarial assumption," in turn, is defined in CAS 413 as "a *prediction of future conditions affecting pension cost;* for example, mortality rate, employee turnover, compensation levels, pension fund earnings, changes in values of pension fund assets." CAS 413.30(a)(1) (emphasis added).

These definitions refer to both the actuarial cost method *in use* and the *prediction of future conditions.* As such, the CAS 413 definitions refer back to CAS 412 and in particular, CAS 412.40(b)(2), which requires contractors to use actuarial assumptions that reflect their prediction of future conditions when they seek reimbursement of their pension costs from the government. CAS 412.40(b)(2) provides in relevant part that *"[e]ach actuarial assumption* used to measure pension cost ... *shall represent the contractor's best estimates of anticipated experience under the plan, taking into account past experience and reasonable expectations."* (emphasis added). Importantly, the term "actuarial assumption" as used in CAS 412 is defined the same as it is defined in CAS 413.[17] Thus, under CAS 413 a contractor is required to determine its pension liability based on the actuarial assumptions it developed under the cost method it used under CAS 412 prior to the segment closing. The cost method developed under CAS 412.40(b)(2) is the only cost method previously in use. Therefore, the actuarial assumptions developed under CAS 412 are the actuarial assumptions referenced in CAS 413.50(c)(12).

---

17. CAS 412 defines "actuarial assumption" as follows: "Actuarial assumption means a prediction of future conditions affecting pension cost; for example, mortality rate, employee turnover, compensation levels, pension fund earnings, changes in values of pension fund assets." CAS 412.30(a)(2).

In such circumstances, the plain language of CAS 413.50(c)(12), including the CAS 413 definitions, refute GM's contention that the "actuarial liability" identified in CAS 413.50(c)(12) requires the use of assumptions that are different from actuarial assumptions established under CAS 412. While, as discussed in greater detail below, CAS 413 expressly provides for the use of different actuarial assumptions where there has been a plan termination, there is no evidence in the language of the regulation to support GM's claim that different actuarial assumptions apply where there has not been a plan termination. To the contrary, the plain language provides that the contractor is required to use the same cost method, including the same actuarial assumptions, that it had used under CAS 412 for the segment closing for the segment closing valuation under CAS 413.

In view of the foregoing, GM's reliance on the phrase "irrespective of whether or not the pension plan is terminated" in the first sentence of CAS 413.50(c)(12) to suggest that the CAS Board intended for termination valuation assumptions to apply regardless of whether a termination occurred is not supported. The referenced language makes clear that a segment closing is independent from a plan termination and that a segment closing may or may not coincide with a plan termination. Based on this possibility, this provision requires that, if a segment has closed, in both plan termination and non-termination situations, a segment-closing adjustment must take place. The provision does not require the flip-side—that termination assumptions would apply to a segment-closing adjustment in both plan termination and non-termination situations.

Language from the Preamble to CAS 413 confirms this view:

It should be noted that the provisions of this section are appropriate whenever a segment performing a material amount of Government business is closed, *irrespective of whether* the closing is caused by the completion of a contract or an organizational change, *or whether the closing results in a complete or partial termination of the plan*. The board emphasizes that the purpose of this provision is to serve as a basis for recognizing and adjusting pension costs previously allocated to the segment being terminated. Such a requirement is *independent of whether employees are terminated from the plan*.

(emphasis added).

Therefore, GM's contention that a segment-closing adjustment is a "settlement" which requires termination assumptions is unsupported by the plain language of CAS 413. While it is true that the contractor and the government "settle" the government's share of the pension liabilities in a segment-closing adjustment, this is not the same as a termination of a pension plan. Significantly, unlike a plan termination, a segment closing does not "settle" the pension liabilities with the plan participants.[18]

### b. CAS 413's Acknowledgment of Actuarial Assumptions Based on ERISA Requirements Was Limited to Plan Terminations.

As noted above, CAS 413 does provide for the use of different valuation rules when there has been a termination of the pension plan. In particular, the second sentence of CAS 413.50(c)(12) provides: "The determination of the actuarial liability *shall give consideration to any requirements imposed by agencies* of the United States Government." (emphasis added). This provision acknowl-

---

**18.** The Armed Services Board of Contract Appeals ("ASBCA") has also held that a segment closing is not the equivalent of a plan termination. *See Gould, Inc.*, 97–2 BCA ¶ 29,254 at 145,544 (Sept. 19, 1997), *aff'd on mot. for recons.*, 98–1 BCA ¶ 29,469 (1998) ("Appellant's plans did not terminate. Appellant's interpretation, that it should proceed on the false premise that the plans had terminated when they had not, is unreasonable."); *Appeal of NI Industries, Inc.*, 92–1 BCA ¶ 24,631 at 122,911 (Nov. 29, 1991)

("Despite the ostensible similarity between a pension plan termination and a segment closing, to the extent of extinguishing future periods to which amortized actuarial gains or losses can be assigned, the situations are not the same."). While the ASBCA was addressing different legal questions under CAS 413 than those raised in this case, its distinction between a plan termination and a segment closing nonetheless is informative here.

edges that other regulatory requirements may apply. Specifically, the Preamble to CAS 413 makes clear that the CAS Board was aware that different valuation rules apply to plan terminations under ERISA and wanted to allow for a different outcome in that circumstance:

> The Board recognizes that, in some cases, *the closing of a segment could be associated with a termination of a plan.* Several commentators noted that, *in such a case,* the actuarial liability for that segment could be greatly influenced by regulations developed pursuant to the provisions of ERISA. *The Standard specifically permits the effect of such regulations to be considered in determining the actuarial liability for the segment.*

(emphasis added). Both the language in CAS 413.50(c)(12) ("shall give consideration to any requirements imposed by agencies") and the Preamble to CAS 413 ("permits the effects of such regulations to be considered") therefore allow for ERISA's requirements to "control" when there is a plan termination. The discussion in the Preamble to CAS 413 demonstrates, however, that the ERISA requirements would apply only to a segment closing calculation that involved a plan termination. There is no indication that the CAS Board intended for ERISA requirements to apply in a non-termination context. Indeed, had the CAS Board intended for contractors to use ERISA standards, including the PBGC actuarial assumptions, in all segment closings it could have easily done so. Plainly the CAS Board did not.

GM contends that the court's reading of CAS 413 will lead to different results depending upon whether the segment closing involves a pension plan termination and is therefore contrary to the CAS Board's intent to treat all contractors the same under its rules. GM's concern is unfounded. While the Cost Accounting Standards are intended to promote uniformity, the different results that arise under CAS 413 when there is a plan termination as part of a segment closing and

when there is not a plan termination are due to the CAS Board's recognition of unique requirements imposed by ERISA. CAS 413 recognizes that a subset of segment closings involve pension plan terminations. Moreover, there are sound policy reasons for the distinction between pension termination and non-termination segment closings. If there is a pension plan termination, ERISA requires contractors to "fully provide all benefit liabilities under the plan" to the plan participants. 29 U.S.C. § 1341(b)(3)(A). When ERISA requires the full payment of pension benefits, the CAS Board acknowledged that the government could be required to recognize its share of these payments. Therefore, CAS 413 allows the contractor to pass on these additional costs to the government. However, where as here, there is no plan termination and the ERISA requirement has not been imposed on GM for the Allison segment, there is no reason to apply the ERISA requirement to the calculation of the segment-closing adjustment. In the case of a plan termination, the pension beneficiaries are guaranteed pension payments. In the case of a segment closing without a plan termination, the pension beneficiaries are in the same position the day after the closing as they were the day before the segment closing. The beneficiaries have been promised certain benefits, but those benefits have not been guaranteed.[19] Therefore, where the benefits are not guaranteed, the CAS Board did not mandate the use of different actuarial assumptions from those used under CAS 412 for purposes of a segment closing valuation.

### c. The Reason for a Segment–Closing Adjustment is Focused on the Calculation of Past Pension Costs under CAS 412.

The connection between a CAS 413 segment-closing adjustment and CAS 412 is identified in the Preamble to CAS 413. As discussed in the Preamble, the reason for the segment-closing adjustment is to account for the fact that under CAS 412 a contractor

---

**19.** The Supreme Court recently recognized this same distinction when it examined the difference between a pension plan merger and a pension plan termination. The Court explained that a merger does not "sever[ ] the applicability of ERISA to plan assets and employer obligations." *See Beck,* 127 S.Ct. at 2318. "Merger is fundamentally different: it represents a *continuation* rather than a *cessation* of the ERISA regime." *Id.* at 2319 (emphasis in original).

may have in the past over-or under-estimated its pension costs (otherwise known as "actuarial gains and losses" [20]) and may have had to amortize these gains or losses over a 15–year period in equal installments. However, when a segment closes, this amortization process comes to an end prematurely. The premature end to the amortization process dictates the determination of previous costs. The Preamble to CAS 413 states that CAS 413.50(c)(12) was designed to deal with the absence of future periods to adjust the pension costs previously determined under CAS 412. The Preamble states:

> As a general rule, the Standard being promulgated today is based on the concept that material actuarial gains and losses applicable to a segment will be taken into account in future cost accounting periods in determining the costs for a segment. *However, a problem arises in cases where a segment is closed. Because there are no future periods in which to adjust previously-determined pension costs applicable to that segment, a means must be developed to provide a basis for adjusting such costs.* ... The Standard now states that when a segment is closed, the contractor shall determine the difference between the actuarial liability for the segment and the market value of assets allocated to the segment.

(emphasis added).

The CAS Board's explanation of the reason for CAS 413.50(c)(12) therefore demonstrates that the adjustment is to account for the end of an amortization process. There is nothing in the Preamble to support GM's view that the purpose of the segment-closing adjustment is to account for the fact that the government relinquishes all risk for future pension costs following a segment closing.[21] To the contrary, the Preamble language fully supports the view that the CAS 413 segment-closing adjustment is a unique adjustment designed to deal with the absence of future periods to amortize actuarial gains and losses that were an outgrowth of the previous pension cost determinations under CAS 412.[22]

### d. CAS 413 Does Not Require a Market–Based Valuation of Actuarial Liability.

The first sentence of CAS 413.50(c)(12) provides as follows: "If a segment is closed, the contractor shall determine the difference between the *actuarial liability for the segment* and the *market value of the assets* allocated to the segment, irrespective of whether or not the pension plan is terminated." (emphasis added). This provision requires that the contractor determine the "market value" of the pension plan assets; however, it does not use the words "market value" with actuarial liability. GM argues that, in requiring a contractor to determine the market value of the assets, the CAS Board necessarily intended that the actuarial liability also be calculated at a market rate (which, as discussed above, GM contends is best reflected by PBGC actuarial assumptions).[23] GM contends that changing to the

---

**20.** CAS 413.30(a)(3) defines actuarial gains and losses as "the effect on pension cost resulting from differences between actuarial assumptions and actual experience." CAS 412.30(a)(4) contains the same definition. Indeed CAS 412 and CAS 413 both contain the same key definitions.

**21.** GM also relies on the phrase "no future periods" in this Preamble language to bolster its argument that the segment-closing provision is a settlement which requires termination assumptions. As discussed above, this argument fails to take into account the rest of the language in the paragraph and must be rejected.

**22.** The fact that the CAS Board was concerned with adjusting *past* pension costs is reflected in the definition of "actuarial liability" which states that it is looking back to the costs charged in prior years, the *"pension cost attributable,* under the actuarial cost method in use, to *years prior* to

the date of a particular actuarial valuation." CAS 413.30(a)(4) (emphasis added).

**23.** GM argues that the principle that the market value of pension assets must be compared to liabilities measured on a termination basis was well established when the CAS Board promulgated CAS 413 in 1977. GM relies on an alternative funding standard under ERISA, which required that the market value of assets be compared to the present value of accrued benefits. "[P]lan assets are to be annually valued on the same basis as the Pension Benefit Guaranty Corporation would have computed them if the plan had terminated.... When the financial status of a plan is examined on a termination basis, it is considered appropriate to use fair market valuations rather than valuations which tend to spread out fluctuations in value." Pl.'s Supp. Brief at 34 (quoting H.R.Rep. No. 93–1280, at 88 (July

market value of assets, while continuing to value the liabilities based on the CAS 412 actuarial assumptions, is actuarially and economically improper because it compares apples and oranges and significantly distorts the calculation of under-funding for the Allison segment to the government's benefit. In response, the government argues that, because pension costs are charged on the basis of the value of the assets, the market value of the assets is required in a segment-closing adjustment.[24]

While GM may be correct that a calculation involving the market value of assets and actuarial liability based on CAS 412 actuarial assumptions is flawed from their actuarial and economic perspective, the court's task is to determine the CAS Board's intent based on the language of CAS 413, rather than based on GM's policy views. As discussed above, the CAS 413 definitions related to actuarial liability dictate that the CAS 412 assumptions are to be used. There is nothing in the language quoted above that specifies that actuarial liability should be changed to a market-based valuation because the value of assets must be based on market rates.

Furthermore, as discussed below, the parties do not dispute that the 1995 revised CAS 413—which contains language nearly identical to that quoted above—contains additional language that explicitly requires that ongoing plan assumptions rather than market assumptions be used in a segment-closing adjustment where there is no plan termination. GM's contention that the original CAS Board would not have required such a calculation because it would be actuarially and economically improper is not supported. As discussed above, the purpose of the segment-closing adjustment was to account for the fact that the amortization process had been cut short. It was not intended to compensate contractors for the "risk" they assume

1974) (Conf.Rep.), 1974 U.S.C.C.A.N. 5038, 5070).

24. GM argues that its interpretation that the calculation of actuarial liability is market-based is also supported by the requirement in the fifth sentence of CAS 413.50(c)(12) that a segment-closing adjustment "calculation . . . be made *as of the date of the event* (e.g., contract termination)

when the government is no longer contributing to an ongoing pension plan.

e. **Revised CAS 413 Confirms that the Actuarial Assumptions Developed Under CAS 412 are to be Used in a Segment–Closing Adjustment Absent a Plan Termination.**

While the actions of the 1995 CAS Board are not conclusive as to the intent of the original CAS Board, the 1995 CAS Board's revisions to CAS 413 demonstrate its understanding of the meaning of original CAS 413. As the Supreme Court has held with respect to the interpretation of statutes, "[s]ubsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction." *Red Lion Broadcasting Co. v. Federal Communications Commission*, 395 U.S. 367, 380–381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). *See also Andrus v. Shell Oil Co.*, 446 U.S. 657, 666 n. 8, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980) ("[W]hile arguments predicated upon subsequent congressional actions must be weighed with extreme care, they should not be rejected out of hand as a source that a court may consider in the search for legislative intent."); *Federal Housing Administration v. Darlington, Inc.*, 358 U.S. 84, 90, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958) ("Subsequent legislation which declares the intent of an earlier law is not, of course, conclusive in determining what the previous Congress meant. But the later law is entitled to weight when it comes to the problem of construction.").

Revised CAS 413.50(c)(12) includes the following language, which is similar to the language that is in dispute here:

If a segment is closed, if there is a pension plan termination, or if there is a curtailment of benefits, the contractor shall determine the difference between the *actuarial accrued liability* for the segment and the *market value of the assets* allocated to

that caused the closing of the segment." (emphasis added). However, the court agrees with the government that it would make little sense to perform that calculation on any date other than the date upon which continued amortization—which was the CAS Board's concern—becomes impossible, i.e., the date of the segment closing.

the segment, irrespective of whether or not the pension plan is terminated.

Revised CAS 413.50(c)(12) (emphasis added). In the next subsection, revised CAS 413 provides, in relevant part, the following additional language:

The actuarial assumptions employed *shall be consistent with the current and prior long term assumptions used in the measurement of pension costs.* If there is a pension plan termination, the actuarial accrued liability shall be measured as the amount paid to irrevocably settle all benefit obligations or paid to the Pension Benefit Guarantee Corporation.

Revised CAS 413.50(c)(12)(i) (emphasis added). The parties do not dispute that, for a segment-closing adjustment subject to revised CAS 413.50(c)(12), contractors must calculate the actuarial liability of a segment using the same actuarial assumptions as those under revised CAS 412.40(b)(2) (which is identical to original CAS 412.40(b)(2)) where there is no plan termination. The parties also do not dispute that, under this revised provision, PBGC actuarial assumptions apply where there is a plan termination. While the 1995 CAS Board does not explicitly address the intent of the original CAS Board, the 1995 CAS Board also does not indicate that it was making a change to CAS 413.50(c)(12) with the inclusion of revised CAS 413.50(c)(12)(i).

GM contends that revised CAS 413 is irrelevant to the determination of the intent of the original CAS Board. GM argues that this court held in *Teledyne,* 50 Fed.Cl. at 177–78, that the inclusion of new and more specific language in revised CAS 413 strongly suggests a new rule of law ("Certainly, the express inclusion of an approach to recover the surplus or deficit of the segment's pension plan attributable to firm-fixed contracts would not have been necessary had firm-fixed-price contracts been included all along.").

GM also argues that the above-cited provision was only added to revised CAS 413 at the final rule stage, and therefore the public did not have the opportunity to provide comments on it. GM contends that this provision was added in response to comments on the proposed final rule by the Department of Defense ("DOD") that "[a]ddditional coverage is needed." Pl.'s Supp. Ex. 9 at 6.[25] GM contends that the fact that DOD was requesting additional coverage indicates that the requirement that ongoing assumptions be used was not included in original CAS 413.

The government acknowledges that the 1995 CAS Board's action does not provide a binding interpretation of the intent of another, differently-constituted Board when it issued the original CAS 413. Nonetheless, the government argues that the 1995 CAS Board's actions are significant in that there is no suggestion in the 1995 CAS Board's comments that it thought it was adopting anything new from what had been required in original CAS 413 in 1977. The government contends that the DOD comments on the proposed final rule were intended to address plans that were "frozen" but not terminated and that there was no suggestion in the DOD comments that PBGC actuarial assumptions

**25.** The letter, dated December 30, 1993, from the Deputy Director of Defense Procurement, DOD, to the 1995 CAS Board states in pertinent part as follows:

The proposed coverage at 9904.413–50(c)(12) provides guidance in the event of a segment closing or a termination gain or loss. Additional coverage is needed, however, for consistency in the application of actuarial assumptions when annuities are not purchased or there is not a required cash distribution to plan participants. In such cases, the plan may be "frozen" but not terminated. If the assumed interest rate is changed from the rate used to charge pension costs to Government contracts, the surplus to which the Government contributed could be eliminated. This is inequitable. Further, the portion of 9904.413–50(c)(12) which addresses the unfunded portion of pension cost for nonqualified plans should be deleted pursuant to our prior discussion on complement funding for nonqualified pension plans. We suggest the following revisions to the coverage at 9904.413–50(c)(12):

Add: "If a segment is closed or there is a termination gain or loss, the determination of the actuarial liability will be based on the actuarial assumptions in place as of the last actuarial valuation, unless the contractor purchases annuities from an insurance carrier or is obligated by law to make a cash-out distribution to participants."

Delete: "plus the current value of any previous years' pension cost that was not funded,"

had been used under original CAS 413 where the plan had not terminated.

The government also argues that the actions of the 1995 CAS Board make clear that there is nothing illogical or inconsistent in requiring the contractor to calculate the actuarial liability of the closed segment using its same CAS 412 actuarial assumptions unless there is a plan termination. The government argues that the 1995 CAS Board reasoned that the pension plan was continuing:

> Consistent with the requirement that actuarial assumptions be individual best-estimates of future long-term economic and demographic trends, this final rule requires that the assumptions used to determine the actuarial liability be consistent with the assumptions that have been in use. This is consistent with the fact that the *pension plan is continuing even though the segment has closed* or the earning of future benefits has been curtailed.

60 Fed.Reg. 16539 (March 30, 1995) (emphasis added).

The court agrees with the government that the explicit requirement under revised CAS 413.50(c)(12)(i) that "current and prior long term assumptions used in the measurement of pension costs" be used in a segment-closing adjustment where there has been no plan termination, as well as the 1995 CAS Board's reasoning that this requirement is "consistent with the fact that the pension plan is continuing," supports the interpretation that the original CAS Board intended for CAS 412 actuarial assumptions to apply in a segment-closing adjustment where there was no plan termination.

First, the 1995 CAS Board's rationale for requiring the use of ongoing actuarial assumptions for pension plans that were continuing demonstrates that this requirement was considered reasonable.

Second, the 1995 CAS Board did not indicate that it was making a change to original CAS 413.50(c)(12) with the inclusion of the language in CAS 413.50(c)(12)(i). This case is unlike *Teledyne,* 50 Fed.Cl. at 177–78, where the regulatory history indicated that the inclusion of fixed-price contracts was new to revised CAS 413. GM is correct that, unlike *Teledyne,* here there was no opportunity to comment on the inclusion of the additional language explicitly requiring the use of ongoing assumptions because this language was added at the final rule stage. Nonetheless, the fact remains that there is nothing in the record that indicates that, at the time of the promulgation of revised CAS 413, the 1995 CAS Board, the government, or the contracting community believed that original CAS 413 required PBGC actuarial assumptions to be applied where the plan was ongoing.[26] Rather, this case is similar to the issue of subcontracts in *CBS Corp. v. United States,* 75 Fed.Cl. 498, 505 (2007), where this court noted that, in contrast to fixed-price contracts, the regulatory history of revised CAS 413 did not include any suggestion that the inclusion of "pension costs attributable to subcontracts was new."

Therefore, revised CAS 413 supports the court's interpretation that CAS 413 required ongoing assumptions to be used in a segment closing adjustment where a pension plan is ongoing.

### 2. GM's References to Non–CAS Agency Interpretations Do Not Overcome the CAS Board's Plain Language.

GM has provided several examples of where government agencies or representatives have compared a segment-closing adjustment to a termination[27] have required

---

**26.** With respect to the DOD comments on the proposed final rule, there is no indication in these comments that PBGC actuarial assumptions were required to be used under original CAS 413.

**27.** Four federal government actuaries who dealt with CAS 412 and 413 wrote an article in which they stated the following about terminated divisions:

> Often at the end of a contract the corporate division that was producing the product or service is closed and the employees are laid off. When this happens an actuarial gain occurs because of the higher level of turnover. But, there are no future periods left under the contract in which to recoup the gain through the normal amortization process. In the case of a typical large defense contractor there are usually other new and ongoing contracts through which the government can participate

that a different ERISA requirement apply in a segment-closing adjustment,[28] or have required that PBGC rates be used in assessing whether a pension plan was overfunded.[29] GM argues, therefore, that outside of the litigation in this case, the government has sought to impose certain ERISA requirements in determining the government's share of pension costs.

While the court is not bound by DCAA documents or statements by government actuaries in construing the CAS Board's intent, see *Martin Marietta Corp.*, 47 F.3d at 1137,

> in the gains. In the case of a contractor who has few or no other government contracts, or whose contract business is dramatically shrinking, the government's share of the gain would not inure to the government. *Thus CAS 413 provides for a final accounting computed as if the division had its own separate plan that had terminated.*
>
> Pl.'s Ex. 8 at 8 (R. Solomon, E. Shipley, J. Norris, & P. Ring, "Pension plans of government contractors," *The Actuary*, Vol. 24, No. 4 (Apr. 1990)) (emphasis added).

**28.** A Defense Contract Audit Agency ("DCAA") memorandum dated March 9, 1995, entitled, "Guidance on the Pension and Post Retirement Benefits (PRB) Other Than Pensions, Adjustments Resulting From IBM's Sale of Federal Systems (FSC) to Loral," states, in relevant part, as follows:

> *Audit Guidance.* As a general rule, the increase or decrease in pension liabilities resulting from curtailment of benefits is included in calculating the pension adjustment. However CAS 413.50(c)(12) provides that:
>
> > "the determination of the actuarial liability shall give consideration to any requirements imposed by agencies of the United States Government."
>
> With respect to other agency requirements, ERISA Section 4022 provides that increases in actuarial liability resulting from pension plan improvements adopted within 60 months of a plan termination shall be recognized on a pro-rata basis. ERISA Section 4022(b)(7) states in part that:
>
> > "Benefits are guaranteed only to the extent of 20 percent of the amount which, but for the fact that the plan or amendment has not been in effect for 60 months or more, multiplied by the number of years (but not more than 5) the plan amendment has been in effect."
>
> *Although the IBM plan was not terminated, the measurement of the segment closing adjustment as required under CAS 413.50(c)(12) is similar to the calculation required for terminations. Accordingly, we believe that this ERISA requirement should be applied to the IBM segment closing adjustment.*

the court nonetheless examined these documents to determine how government agencies with contracts subject to CAS 413 have interpreted CAS 413 provisions. However, these documents provide no evidence that the government has asserted that PBGC actuarial assumptions are required in a CAS 413 segment-closing adjustment where the pension plan is ongoing. Specifically, in the instance where DCAA prescribed the use of PBGC actuarial assumptions, it was for audit purposes unrelated to a segment-closing adjustment.

> Pl.'s Supp. Ex. 2 at 4 (emphasis added).
>
> However, the ERISA requirement at issue in this DCAA memorandum concerns the recognition of improvements to a benefit plan and does not involve the use of PBGC actuarial assumptions.

**29.** A DCAA memorandum dated June 20, 1986, entitled, "Audit Guidance on Overfunded Pension Plan Costs," states, in relevant part, as follows:

> One of the problems encountered by auditors in identifying when a contractor's plan is overfunded is that actuarial reports will generally show a conservative underestimate of the assets and an overestimate of the liabilities....
>
> When determining the funding status of a pension plan, auditors should review the contractor's public financial statement in addition to the actuarial report.... Among other things, this statement contains three requirements which will result in a more realistic identification of the current funding status in the event the company were to terminate its pension plan. These three requirements are that:
>
> 1. Pension assets are to be measured at current market values *rather than the more conservative actuarial values.*
> 2. Accumulated plan benefits are to be calculated at current salary levels with no provision for future salary accruals or future salary increases; and
> 3. *A current interest rate published by the Pension Benefit Guaranty Corporation must be used* (which tends to be higher than the long term rate used by many contractors in developing pension cost under Government rules).
>
> Pl.'s Ex. submitted on July 20, 2007 (emphasis added).
>
> However, the DCAA's recommendation of the use of PBGC actuarial assumptions was specific to audit situations to determine whether a pension fund was overfunded, in which case a contractor could no longer charge the government for its pension costs under CAS 412.40(c). *See Eastman Kodak Co. v. Rumsfeld*, 317 F.3d 1377 (Fed.Cir.2003). This memorandum does not deal with segment-closing adjustments.

GM also argues that the CAS Board intended to include requirements from other agencies that applied to situations similar to a segment-closing adjustment. Specifically, GM argues that CAS 413 incorporates a Department of Energy ("DOE") requirement that applies PBGC actuarial assumptions upon the termination of certain DOE contracts.[30] However, DOE's requirement was not in effect at the time CAS 413 was promulgated. DOE's requirement is not based on CAS 413 and therefore was a separate contractual arrangement. Furthermore, DOE explicitly required the use of PBGC actuarial assumptions, whereas CAS 413 makes no such explicit requirement.

Therefore, GM's additional evidence does not contradict the court's interpretation of CAS 413.50(c)(12). These references cannot overcome the clear intent of the CAS Board as stated in the plain language of CAS 413.[31]

### CONCLUSION

For the reasons stated above, the court holds that CAS 413.50(c)(12) requires the use of GM's actuarial assumptions under CAS 412.40(b)(2) to calculate GM's actuarial liability for the segment-closing adjustment for the Allison segment. Therefore, the court **GRANTS** the government's motion for partial summary judgment regarding the interest and mortality rate assumptions to be used in a segment-closing adjustment under original CAS 413.50(c)(12). The plaintiff's motion for partial summary judgment is therefore **DENIED.** The parties shall submit a joint status report by **September 28,** 2007 detailing the next steps for resolving this litigation.

**IT IS SO ORDERED.**

---

30. Under an order in effect from August 23, 1982 through September 30, 1996, DOE used PBGC actuarial assumptions to determine its funding obligations upon the termination of contracts with companies that operated DOE-owned facilities. DOE Order 3830.1, Pl.'s Ex. 18.

31. In addition, both parties argue that the other party's position would result in a windfall to the other party. GM argues that if the actuarial assumptions developed under CAS 412 were used, the government would be allowed to reap the benefits of GM's future investment approach without bearing any of the risks that approach entails. By contrast, the government argues that, without a plan termination, using the PBGC actuarial assumptions would allow GM to recover the difference if future experience proves more favorable. The court believes that neither of these "windfall" arguments are relevant to the meaning of CAS 413.50(c)(12) and therefore does not consider them here.

